946 N.E.2d 1233 (2011)
In re the Marriage of Diane WERNER, Appellant-Petitioner,
v.
Gregory WERNER, Appellee-Respondent.
No. 46A03-1008-DR-447.
Court of Appeals of Indiana.
April 14, 2011.
*1235 Benjamen W. Murphy, Law Office of Ben Murphy, Merrillville, IN, Attorney for Appellant.
William Janes, David K. Payne, Michigan City, IN, Attorneys for Appellee.

OPINION
CRONE, Judge.

Case Summary
Diane Werner ("Mother") petitioned to dissolve her marriage to Gregory Werner ("Father") and continued to live in the marital residence with him and their two young children. Eventually, Mother petitioned to relocate with the children thirty-five miles away to be closer to her employment. Father objected to the proposed relocation. The trial court judge granted Mother's petition to relocate and awarded Father parenting time.
Prior to the final dissolution hearing, Mother and Father were able to agree on all issues except physical custody of the children. A different judge presided at the final hearing. In the dissolution decree, the judge awarded the parties joint legal custody of the children, with primary physical custody to Mother. The judge also announced that he would hold a future custody hearing and that "the determination as to whether residential and/or joint custody should be modified should be governed by the `best interests' test, as opposed to the standard which governs the modification of custody orders," which also requires a substantial change in one or more factors affecting the children's best interests.
Mother did not object to this announcement, nor did she object at the subsequent custody hearing when the judge again announced that his determination would be governed by the best interests standard. After the hearing, the judge issued an order in which he found that it would be in the children's best interests for Father to be their primary physical custodian and awarded Mother parenting time.
Mother now appeals from the trial court's custody order, arguing (1) that the court used the wrong standard in determining whether to modify custody and (2) that the court's findings are insufficient to support its judgment under either standard. We conclude that Mother waived her first argument by failing to object at the custody hearing and that the trial court's findings are sufficient to support its judgment under the best interests standard. Therefore, we affirm.

Facts and Procedural History
Mother and Father were married in January 1999. Two children were born to the marriage: K.W., born in January 2000, and A.W., born in December 2002. In April 2008, Mother petitioned to dissolve the marriage. Initially, Mother and Father continued to reside together in the marital residence in Wanatah. In June 2008, Mother filed a notice of intent to relocate with the children to Crown Point, which is approximately thirty-five miles from Wanatah, so that she could be closer to her place of employment. Father objected to Mother's proposed relocation and requested a hearing and a restraining order to prohibit her from relocating with the children.
Senior Judge Thomas W. Webber Sr. held a hearing on these matters on August 14, 2008, and issued an order the following day. The order permitted Mother to relocate to Crown Point with the children, with Father to "have parenting time as the parties agree or as provided in the parenting time guidelines." Appellant's App. at 17. The order also appointed Amber Lapaich as the children's guardian ad litem ("GAL").
*1236 Senior Judge Steven E. King presided at the final dissolution hearing, which was held on April 7, 2009. At that point, Mother and Father had agreed on all matters except physical custody of the children. Mother filed a motion for special findings pursuant to Indiana Trial Rule 52(A). On April 29, 2009, Mother and Father filed a final property settlement agreement with the trial court. On May 4, 2009, Senior Judge King issued a final dissolution decree, which reads in pertinent part as follows:
9. On August 15, 2009, Senior Judge Thomas W. Webber entered a provisional order in which he granted temporary custody of minor children [K.W.] and [A.W.] to [Mother], authorized her to relocate to the Crown Point area where she was employed, and appointed Amber Lapaich as the guardian-ad-litem heretofore discussed.
10. That relocation occurred just prior to the commencement of the 2008-09 school year.
11. Accordingly, [K.W.] and [A.W.] commenced the present school year in a private school located in Crown Point known as Trinity Lutheran School. [K.W.] was enrolled in the third grade, while [A.W.] commenced her educational journey as a kindergarten student.
11. [sic]. Both students have remained in Trinity Lutheran [S]chool from the beginning of the 2008-09 school year through the date of the final hearingApril 7, 2009.
12. [sic]. Testimony of the principal of Trinity Lutheran School, John E. Schultz, together with the report cards of the two children compiled through the third quarter of [] Trinity's four-quarter school year, establish that each child has a strong attendance record, that each is successful academically, and that each demonstrates social skills, self-discipline and individual conduct in conformity with the expectations and norms of Trinity Lutheran School. Each has been sent to the office of Principal Schultz to be commended by him as a part of a practice of positive reinforcement utilized at the school.
13. [sic]. Both children are enrolled in Trinity Lutheran's "extended care" program as a result of the weekday work schedule of [Mother]. The children arrive at school at approximately 6:30 a.m. for snacks, television, and reading. The school day commences at 7:30 a.m. and concludes at 3:00 p.m. The children remain in the after-school "extended care" program until 4:30 p.m. when [Mother] picks them up. After-school activities are age-based and include snacks and playtime. Evidence established the children have been model participants in that program.
14. [sic]. Prior to his enrollment at Trinity Lutheran, [K.W.] had been enrolled for kindergarten through 2nd grade at South Central Elementary School, a public school not far from the marital residence in LaPorte County. The academic records of [K.W.] from South Central reflect that at that school [K.W.] had a similarly strong attendance record and an accomplished academic performance consisting entirely of As and Bs, including particular achievement in reading. Trinity principal John Schultz acknowledged that the foundation laid at South Central was a contributing factor in [K.W.'s] success at Trinity.
15. [sic]. Evidence further established that, at times, anger management issues had caused [K.W.] to appear in the principal's office at South Central. These problems, at least to date, have not continued at Trinity Lutheran.

*1237 16. [sic]. Significantly, both parents have been active in nurturing their children's love of reading.
17. [sic]. During the course of the marriage both parents were actively involved in the care and feeding of the children on a daily basis, including matters of school [[K.W.]] cooking, daily care, and their children's friends and general well-being.
18. [sic]. As temporary custodian of the children [Mother] has made a concerted effort to engage the children in extracurricular activities,[[1]] including choir, Sunday School, and, variously, flag football, soccer, gymnastics, basketball, swimming lessons, a walkathon, and activities at and membership in the Crown Point YMCA, which is located just minutes from [Mother's] residence[.]
19. [sic]. To [Mother's] credit, she has recognized the desire of [K.W.] to play summer baseball with his friends and teammates from prior summers in LaPorte County and has honored that desire by enrolling [K.W.] with that same LaPorte County summer baseball program for the upcoming summer of 2009. Meanwhile, [Father] has signed the children up for 4-H and county fair activities in LaPorte County for the summer of 2009; the children are looking forward to that involvement, according to [Mother].
19. [sic]. [Mother] has been effective in communicating with [Father] information regarding the children's activities and events. Since her Relocation to Crown Point, however, [Father] has generally declined to attend activities of the children in the Crown Point area, in part because of the distance in travel and, on occasion, out of concern for the potential unease that might arise by reason of the male company that [Mother] might keep at the event. A natural resentment and frustration experienced by [Father] over [Mother's] decision to seek this dissolution, together with her subsequent relocation, may be slowly resolving itself but, nonetheless, has been counterproductive to the children's best interests and well-being.
20. [sic]. Likewise, the paternal grandparents of [K.W.] and [A.W.] have not attended activities of the children in Crown Point. Again, distance and traffic concerns have apparently been a factor in their absence, as has the unfortunate and mutual alienation from [Mother] that came from this dissolution.
21. [sic]. Both [K.W.] and [A.W.] enjoy a positive relationship with their paternal grandparents, who reside close by [Father's] residence at the Werner family farming operations. Both children also enjoy a close relationship with their cousins [S.] and [E.], who attend South Central. They also have two other cousins in the nearby Wanatah area, although the time spent with those two was less common.
Maternal grandparents are deceased. [K.W.] and [A.W.] apparently enjoy a relationship with the children of Kerrie *1238 Dye, their mother's best friend who resides in nearby Griffith.
22. [sic]. [Mother's] residence in Crown Point is located in a recently built subdivision composed of identical townhomes, each of which has a small yard. Each children has their [sic] own bedroom and closet.
[Father] resides in the country in a quiet and relatively secluded area adjacent to open fields that he farms and a Christmas tree farm[.] Again, each child has their [sic] own bedroom and closet, both larger than that in their Crown Point townhouse. The yard provides a larger play area for the children, as does the larger home. The children's bedrooms have been painted in rural farm themes.
23. [sic]. It is not disputed that both children enjoyed the opportunities that the rural farm setting and farming operations that the marital home provided, just as they also missed the larger play areas and bedrooms of the marital residence which were lost by the relocation of [Mother] to Crown Point.
24. [sic]. Likewise, as emphasized by the guardian-ad-litem in her report[,] [t]here is no dispute that nine-year-old [K.W.] has a strong attachment to the family farming operations of the extended Werner family, which involves approximately 1800 acres of corn and soybeans. In fact, [K.W.] expresses his intention to be a farmer and, according to the guardian-ad-litem, has a rather focused desire to spend time on the farm with his father and grandparents.
25. [sic]. The guardian-ad-litem has noted in her report filed October 10, 2008just two months after the relocationthat had [Mother] remained in the Wanatah area near the marital home, "... this divorce would have been a lot easier on the children and everyone involved." That observation bears significant import here.
At first blush the relocation might seem minor in nature. As noted, however, traffic patterns at a given time of day can make the one-way trip a rather arduous 45-minute venture. The upshot, as the guardian-ad-litem observed, effectively precludes the exercise of weekday parenting time by [Father] at the LaPorte County farm. In turn, especially [K.W.], but also [A.W.], loses time at the farm. For the Werner children their parents' respective homes are now rooted in the very divergent lifestyles that exist between urban townhouse and rural farm settings. And, significant to their best interests, [K.W.] and [A.W.] have suffered a loss of "everyday" time with their extended family of paternal grandparents and cousins that came with their rural setting.
It should also be noted that, on a temporary basis while this proceeding evolved, the relocation may have served in some ways to ease the stress and strain on [K.W.] and [A.W.] attendant to [Father's] natural resistance to this divorce and the contretemps which caused a breakdown in [Mother's] relationship with the paternal extended family.
In all this the best interests of the two children will truly be served if nature be allowed to take its course. That is, [Father] and [Mother] must strive to put their divorce behind them, to continually work at communicating effectively[,] cooperating, and compromising with each other as parents and joint custodians, and to engage each other, extended family and their children's friends in [K.W.] and [A.W.'s] activities. Given time, experience, and the opportunity to understand and to be heard free of the negative clutter common to the worst divorces, it is likely [K.W.] and [A.W.'s] *1239 natural resilience will carry them forward to "happy and healthy lives."
26. [sic]. To that end the court finds the following to presently be in the best interest of [K.W.] and [A.W.]:
A. Residential custody of the children for the duration of this school year and the 2009-2010 school year with [Mother] in Crown Point will provide them with continuity of instruction and stability in an educational setting [Trinity Lutheran] where the evidence indicates they have thrived; that time frame will further permit his parents, as well as [K.W.], a more extended opportunity to compare the relative advantages and disadvantages of his matriculation at Trinity Lutheran [where the schooling only goes through grade 8], as opposed to his potential return to the South Central school system in LaPorte County;
B. Two days after the final day of the traditional school year at Trinity Lutheran for the 2008-2009 school year and the 2009-2010 school year, [r]esidential custody of both [K.W.] and [A.W.] shall be at the residence of [Father], which residential custody shall, for each summer, continue until a date ten [d]ays prior to the first day of the commencement of the school year at Trinity Lutheran, subject to any further court orders which may follow from the review hearing hereinafter discussed. During the summer residential custody granted to [Father] herein, [Mother] shall be entitled to parenting time with the two children on alternating weekends and on one weeknight, as contemplated in the Indiana Supreme Court's Parenting Time Guidelines. Lest any ambiguity exist, the summer residential custody provided herein overrides the split summer parenting time generally contemplated in the guidelines. These provisions will facilitate the children's participation in the LaPorte County 4-H programs, [K.W.'s] involvement in the local baseball program as already coordinated by [Mother], and, of greater consequence, provide the children with more extensive involvement with their extended farm family and serve [K.W.'s] interest and involvement in the critical months of a corn and soybean farming operation.
C. A review hearing should be set for a date between July 15 and August 10, 2009 [sic], to review these terms of residential and joint custody; at that hearing the determination as to whether residential and/or joint custody should be modified should be governed by the "best interests" test, as opposed to the standard which governs the modification of custody orders.

D. [Father's] request that this court conduct an in-camera interview with [K.W.] [to which Mother objected] is deferred until that future hearing in order to provide him with a more extended comparison of his life circumstances in the two location[s], including but not limited to schools, friends, interests, sports, etc., to provide him with the time to mature and make an informed judgment free of any strain associated with this proceeding, andat least for now to relieve him of the onus and responsibility of making a choice between his two parents; it is noted that the Guardian-ad-litem has effectively presented his desires and circumstances to the court... and, in that respect, Amber Lapaich's representation of the two children should continue and she is requested to file a Report to the Court on or before June 20, 2010.
WHEREFORE, IT IS ORDERED AND ADJUDGED that the marital bonds of [Mother] and [Father] be, and are hereby, dissolved, and the parties *1240 are hereby restored to the state of unmarried persons.
IT IS FURTHER ORDERED AND ADJUDGED that [Mother] and [Father] be, and are hereby, granted to joint legal custody of their children [K.W.] and [A.W.], with residential custody of the two children to be [as described above].
. . . .
A review hearing is now set for 8:30 a.m. to 4:00 p.m. on August 3, 2010 to determine whether the orders of joint legal and/or residential custody should be modified, all per the terms of subparagraph 26 herein [.]
Id. at 49-57 (emphases added) (citations omitted).
The custody review hearing was held as scheduled on August 3, 2010. Mother again filed a motion for special findings pursuant to Trial Rule 52(A). As the hearing began, Senior Judge King reiterated that "the issues before the Court will be governed by the best interest standard applied to initial custody determinations as opposed to any modification proceedings." Tr. at 264. Neither Mother nor Father objected to this statement. On August 11, 2010, Senior Judge King issued an order on the determination of residential custody and related matters that reads in pertinent part as follows:
3. At the outset of the hearing [Father's counsel] requested that this court consider as evidence the two reports of Guardian-Ad-Litem Amber La[p]aich filed June 17, 2010, and October 10, 2008, respectively, and, furthermore, that this court take judicial notice of its specific findings of fact and conclusions of law issued May 4, 2009. Those motions were granted without objection from the opposing party.
. . . .
5. Prior to the issuance of [these] findings, several matters are noted:
a) This "review" hearing was set on the court's own motion in the Final Dissolution Decree issued May 4, 2010 [sic] by the same undersigned senior judge presiding at this review; significantlyand without objection from either party, the court ruled on May 4, 2010 [sic] "that the determination as to whether residential and/or joint custody should be modified [at this review hearing] should be governed by the `best interests' test, as opposed to the standard which governs modifications of custody orders for reasons implicit to the circumstances then extant [;]
b) it is emphasized that the final dissolution decree of May 4, 2010[sic] contains extensive specific findings of fact and conclusions of law issued pursuant to a Trial Rule 52 request filed at the final hearing and that those findings of fact have not been challenged by either party;
c) an in-camera interview of minor child [K.W.] was conducted by the court after the conclusion of that evidence presented in open court; that interview occurred outside the presence of the parents and counsel, was conducted under oath, and was recorded by [the court reporter]; and
d) minor child [A.W.] was provided with the opportunity to be heard in-camera, either alone or in the company of her older brother, and declined that opportunity.
. . . .
7. This court's specific findings of fact set forth in the final dissolution decree issued May 4, 2009, provide an understanding of the bulk of the factual context, circumstances and forces at play in the custody determination at issue. In large part those facts remain *1241 unchanged. [The court then incorporated findings seven through twenty-five of the dissolution decree "for purposes of the custodial determination ultimately issued herein."]
7. [sic]. Since that date both children have continued to perform well academically at Trinity Lutheran School, meeting academic expectations with strong attendance records. Principal John Schultz testified that both parents were very positive, caring and concerned parents, acknowledged once again that the academic foundation [K.W.] had received at South Central, where he attended the first and second grades, contributed to his success at Trinity Lutheran during the 3rd and 4th grades, and ultimately concluded that "I anticipate they would be successful wherever they [K.W. and A.W.] go."
8. [sic]. Psychologist [Megan] Thomas, whom [Mother] engaged to counsel the children agreed with the conclusion that the children will do well at either Trinity Lutheran, the private school where the children are presently enrolled, or at South Central, the public school district where they would attend if residential custody rested with [Father]. She testified that [K.W.] was mature and insightful for his age, that he was "adamant" that he wants to live with his father, and that he was "pretty obsessed" with farming; those same conclusions were reached by Guardian-Ad-Litem Amber La[p]aich, who stated that "[K.W.] is still very set that he wants to live with his father and be on the farm" and that he sees "his father not only as a parental figure but also as a best friend."
9. [sic]. Psychologist Thomas and Guardian Ad-Litem La[p]aich also shared some similar conclusions regarding seven-year[-]old [A.W.]. Both perceived her to be somewhat closer to her mother and less stressed by the divorce proceedings than brother [K.W.]. Ms. La[p]aich attributed [A.W.'s] generally better emotional acceptance of her circumstances as a product of her youth and the fact that the divorce and her mother's relocation to Crown Point did not uproot her from a school, as it had [K.W.]. That observation was generally echoed by Ms. Thomas, who indicated that [A.W.] had more of a "go with the flow["] approach and was comfortable in both locations.
10. [sic]. On several matters of ultimate import, Ms. Thomas and Ms. La[p]aich also shared certain sentiments.
First, Ms. La[p]aich ultimately concluded that the joint legal custody order and split residential custody order should remain in place, with [Mother] acting as residential custodian during the school year and [Father] acting as residential custodian during the summer school recess. Ms. Thomas testified that the "present situation["] was "probably the best" but added that as long as both parents were "supportive," the children would adjust to any situation. Ms. La[p]aich, who implored the parents to reach an agreed resolution of the instant question in her report, opined that if [K.W.] did not see his parents ["]working as a team" he would "harbor some resentment toward his mother" and likely play one against the other.
Additionally, both observed that [K.W.] an[d] [A.W.] have a very strong and close sibling relationship and that consistent with the stated preference in Indiana lawit would not be in their best interests to be separated from each other in residential placement.
Finally, both emphasized, as did the testimony of both [Mother] and [Father] *1242 that it was important for [K.W.'s] emotional well-being that this matter be "finalized."
11. [sic]. Evidence introduced at the hearing held August 3, 2010, the court's findings of May 4, 2009, and the reports of Ms. La[p]aich, establish that both parents are fit and proper persons to serve as residential custodians. Evidence further indicated thatin large part[Mother] and [Father] have fulfilled their obligations to communicate and cooperate with each other as joint legal custodians, although notable failures have occurred. Inexplicably, the children were enrolled in 4-H programs in both LaPorte and Lake counties, apparently violating a 4-H rule prohibiting enrollment in the same projects in both counties. That transgression became an issue between the parties that, while corrected, seems particularly unnecessary given that one of the recognized purposes of this court's decision of May 4, 2009 providing [Father] with summer residential authority was to "facilitate the children's participation in the LaPorte County 4-H programs...." Indeed, the dual enrollment lends credence to a concern of [Father], as discussed in a footnote at page 5 of the final dissolution decree, that [Mother] engages the children in too many activities highlighting a philosophical parenting difference contrary to the foundation necessary to sound joint legal parenting.
Additionally, [Mother] decided to engage the children in counseling with [Megan] Thomas without first consulting [Father], although she did inform him of that intent and Ms. Thomas's identity prior to the actual commencement of counseling.
Otherwise, the demands of the adversarial process produced some inevitable carping in cross-examination. [Mother] implied that [Father's] resentment over the divorce would impede his ability to reach out to [Mother] was [sic] he the primary custodian. [Father] suggested that [Mother's] acquisition of a kitten just three days prior to the August 3, 2010, hearing was a ploy to curry favor with [A.W.] in the face of the pending motion for an in-camera interview.
This unfortunate finger[-]pointing does not dissuade the court from the conclusion that based on the intelligence of the parents and their mutual love of their children, they remain capable of serving as joint legal custodians and should be provided with that continuing opportunity to serve the best interests of [K.W.] and [A.W.]. Still, the matters set forth in this finding [# 11] may be helpful for future reference if future litigation regarding custodial matters occurs.
12. [sic]. Among the purposes of this court's order of May 4, 2010 [sic], and its delayed approach to the question of residential or physical custody was the opportunity it would provide [K.W.] ... to have a more extended comparison of his "life circumstances in the two locations." Having had that opportunity, together with an opportunity to gain some additional maturity, his undisputed and adamant preference to live with his father on the family farm has greater credence than it held back in May of 2009.
13. [sic]. Testimony established that were the children to be placed in the residential custody of their father, their school day would consist of their father's delivery of them to the paternal grandparents' homethe site of the family farmwhere, at approximately 7:20 a.m., they would board the bus for school. Following the conclusion of the school day at 3:00 p.m. they would then board the school bus for the fifteen[-]minute *1243 return ride to their grandparents' home and the farm where [Father] is at work.
In rather stark contrast is their school day in Crown Point. Given [Mother's] daily work schedule, the children are delivered to Trinity School at "approximately 6:30 a.m.", although in-camera [K.W.] indicated it was closer to 6:00 a.m. Snacks, television, and reading consume their time until school starts at 7:30 a.m. After the regular school day ends, the children remain at the school until 4:30 p.m. in the "extended care" program discussed in finding 13 of the final dissolution decree. Testimony established that on occasion, one of [Mother's] girlfriends would take them to the library or elsewhere and that it was those girlfriends who, on a daily basis, take [K.W.] and [A.W.] to [Mother's] home, where she returns from work at about 5:15 p.m.
14. [sic]. The daily exposure to the paternal grandparents which the children would enjoy highlights another determinative factor in play. [Mother's] parents are both deceased and she has no relatives living near her home in Crown Point. Again, in marked contrast are the various tangible and intangible benefits of extended familial relationships which the children would reap on a regular and daily basis were they in the residential care of their father.
[K.W.] and [A.W.] enjoy close relationship[s] with cousins [S.] and [E.], who live in the area near father and attend South Central school. They are the children of [Father's] sister named Kelly Rice. Another of [Father's] sisters[,] Kim, with whom the children enjoy a close relationship, is a teacher at South Central. Two additional cousins live in nearby Wanatah. Guardian-Ad Litem Amber La[p]aich indicated "These individuals are very important to these children."
[Father's] home is a mere mile and a quarter from paternal grandparents' home, enhancing their opportunity to draw on the exposure to their only grandparents.
15. [sic]. Testimony established that South Central, the public school in [Father's] locale, is a small rural school where all the teachers know each other. The circumstance that the children's Aunt Kim is one of those teachers bodes well for their oversight and educational experience.
16. [sic]. Three other factors remain that are worth noting. While [K.W.] has developed friends at Trinity Lutheran, those friends do not necessarily reside in geographic proximity to him inasmuch as they matriculate by their parents' choice from wherever their homes happen to be. At the public school that South Central is, his friends are generally more accessible since they commonly reside [] within the geographically-defined school district.
Second, [Mother] now lives in a home in Crown Point. [K.W.] indicated during the in-camera interview that he was allowed to ride his bike only to the end of the cul-de-sac. While such a restriction likely speaks well of [Mother], matters set forth in findings 22 and 23 in this court's Final Dissolution Decree speak to the less restrictive outdoor environment and greater "room to roam" the children would have at their Father's home.
Third, Trinity Lutheran [S]chool only accommodates matriculation through the eighth grade. South Central is a kindergarten through 12th grade school. If placed in the residential care of [Father], they are virtually certain to experience both continuity in their academic *1244 instruction and in the stable of friends they develop at school, avoiding yet another major disruption in their young personal lives.
17. [sic]. For all the reasons set forth herein, it would be in the best interest of [K.W.] and [A.W.] that [Father] serve as the residential or physical custodian of the two children.[[2]]
18. [sic]. It would be in the best interest of [K.W.] and [A.W.] that [Mother] be granted those rights of parenting time set forth in the Indiana Supreme Court's Parenting Time Guidelines, albeit the parents, as joint legal custodians[,] should endeavor to schedule the children's time in a manner to pursue their summertime interests to the extent possible, excluding [K.W.'s] purely farm-related interests; that is those interests will be served adequately by his increased [] exposure to planting, summer aspects of farming, and harvest.
Appellant's App. at 70-78 (initial emphasis added) (citations omitted). Mother now appeals.

Discussion and Decision
"We review custody modifications for abuse of discretion with a preference for granting latitude and deference to our trial judges in family law matters." K.I. ex rel. J.I. v. J.H., 903 N.E.2d 453, 457 (Ind.2009) (citation and quotation marks omitted). When a party has requested special findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. Kondamuri v. Kondamuri, 852 N.E.2d 939, 944 (Ind.Ct.App.2006). "The judgment will be reversed if it is clearly erroneous." Id. "In reviewing the judgment, we first must determine whether the evidence supports the findings, and second, whether the findings support the judgment. Findings of fact are clearly erroneous *1245 when the record lacks any evidence or reasonable inferences from the evidence to support them." Id. (citation omitted).
To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. We will not reweigh the evidence or assess witness credibility. Even though there is evidence to support it, a judgment is clearly erroneous if the reviewing court's examination of the record leaves it with the firm conviction that a mistake has been made.
Id. (citations omitted).
Mother challenges the trial court's custody determination on several grounds, the first being that the court applied the wrong standard in making its determination. See id. ("A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts."). Mother points out that the standard for an initial custody determination is set forth in Indiana Code Section 31-17-2-8, which reads in pertinent part as follows:

The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:
(1) The age and sex of the child.
(2) The wishes of the child's parent or parents.
(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
(4) The interaction and interrelationship of the child with:
(A) the child's parent or parents;
(B) the child's sibling; and
(C) any other person who may significantly affect the child's best interests.
(5) The child's adjustment to the child's:
(A) home;
(B) school; and
(C) community.
(6) The mental and physical health of all individuals involved.
(7) Evidence of a pattern of domestic or family violence by either parent.
(Emphasis added.)
The standard for custody modification is set forth in Indiana Code Section 31-17-2-21, which reads in pertinent part as follows:
(a) The court may not modify a child custody order unless:

(1) the modification is in the best interests of the child; and

(2) there is a substantial change in one (1) or more of the factors that the court may consider under section 8 ... of this chapter.

(b) In making its determination, the court shall consider the factors listed under section 8 of this chapter.
(c) The court shall not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child as described by section 8 ... of this chapter.
(Emphases added.)[3]
Mother asserts that the trial court clearly erred by applying the "best interests" *1246 standard in determining the children's custody post-dissolution. We conclude that Mother has waived her claim of error because she failed to object to the court's announcementboth in the dissolution decree and at the beginning of the subsequent custody hearingthat it was going to use the best interests standard in making its custody determination. See Trout v. Trout, 638 N.E.2d 1306, 1307-08 (Ind.Ct.App.1994) ("A timely objection is a prerequisite to appellate review. An appellant cannot sit idly by without objecting, await the outcome of trial, and thereafter raise an issue for the first time on appeal. Had Husband raised an objection to the format of the hearing, and the trial court nevertheless insisted on proceeding in this abbreviated manner, Husband might be entitled to relief. However, that is not the case. Husband, through his silence, is held to have assented to proceeding in this irregular manner. Thus, he is entitled to no relief") (citation and quotation marks omitted), trans. denied.[4]
In a footnote, Mother acknowledges that "[a] party's failure to object constitutes waiver." Appellant's Br. at 14 n.1 (citing Angleton v. State, 714 N.E.2d 156, 159 (Ind.1999)). She then asserts, however, that "[f]undamental error can be challenged at anytime." Id. (citing A.L. v. Wishard Health Servs., 934 N.E.2d 755, 758 (Ind.Ct.App.2010), trans. pending).
Fundamental error is error which is a blatant violation of our concepts of fundamental fairness and in which the harm or threat of harm is substantial and apparent. It is error which is so likely to have infected the verdict or judgment that confidence in the correctness of the trial result has been undermined.
Matter of Commitment of Gerke, 696 N.E.2d 416, 421 (Ind.Ct.App.1998) (citation omitted). "The mere fact that error occurred and that it was prejudicial will not satisfy the fundamental error rule." Wilson v. State, 931 N.E.2d 914, 919 (Ind.Ct. App.2010), trans. denied. Fundamental error, therefore, requires the appellant to show greater prejudice than ordinary reversible error because no objection has been made. Id.
Mother contends that
[t]he constitutionally protected right of parents to establish a home and raise their children mandates that failure of a trial court to require compliance with any condition precedent to the termination of this right constitutes fundamental error which this Court must address sua sponte. It would constitute fundamental error to interfere with the custodial relationship between [Mother] with the children by not applying the *1247 modification standard as opposed to the best interest standard after an initial custody arrangement has been made.
Appellant's Br. at 14 n.1 (citations omitted).
Two observations are in order. First, we are not dealing with the termination of Mother's right to establish a home and raise her children. We are dealing solely with the determination of primary physical custody of the children post-dissolution. Second, Mother cites no authority for the propositionand indeed makes only a bald assertionthat the trial court's use of the best interests standard in deciding that issue under the facts of this case constitutes fundamental error. Consequently, we find no merit in Mother's claim. See Glass v. Cont'l Assurance Co., 415 N.E.2d 126, 128 (Ind.Ct.App.1981) ("Since Glass merely makes a bald assertion of [fundamental] error without presentation of cogent argument or citation to applicable authority, his contention need not be reviewed by this Court."), trans. denied.
The dissent insists that we should not recognize Mother's waiver of her right to challenge the best interests standard agreed to by the parties and applied by the trial court because, in doing so, we are ignoring the importance a stable home plays in the lives of children. To the contrary, the purpose of the trial court's decision here was to allow enough time to gather sufficient information before entering a final custody determination on less than complete information that could not be altered absent a substantial change in circumstances. The court could have delayed ruling or bifurcated these proceedings. Instead, with the parties consent, the trial court entered an order which allowed these children a period of adjustment rather than making a snap decision as to their best interests. The trial court exercised extreme thoughtfulness and restraint in this regard and, we believe that the trial court's deviation from the general modification standard served the purpose of promoting true long term stability for these children. This is the cornerstone of our statutory law.
Finally, to the extent Mother argues that the trial court's detailed findings and judgment are clearly erroneous under the best interests standard, her argument is essentially an invitation to reweigh evidence and assess witness credibility in her favor, which we may not do. Although we do not condone the trial court's departure from established statutory procedures and in fact strongly discourage similar departures in future caseswe cannot say that our review of the record has left us with the firm conviction that a mistake has been made in this case. Accordingly, we affirm the trial court's judgment.
Affirmed.
BRADFORD, J., concurs.
KIRSCH, J., dissents with separate opinion.
KIRSCH, Judge, dissenting.
Were this a case involving the property rights of Diane Werner and Gregory Werner, I would join my colleagues in affirming the trial court's decision on the basis that Diane waived her right to appeal the trial court's ruling by failing to make a timely objection to the trial court's decision to use an improper decisional standard.
It is not such a case.
Rather, the case involves not only the parental rights of the parties, but also the fundamental rights of their children to a stable home. The importance of such stability is the policy that underlies Indiana Code Section 31-17-2-21. To give effect to this policy, our General Assembly directed *1248 that Indiana's courts modify their custody decisions only upon a showing of a substantial change in one of the enumerated factors. Because the affected interests of such decisions extend beyond the interests of the parents, parents cannot waive this standard.
The trial court committed clear error in ignoring the express statutory directive. I would reverse its decision and remand for further proceedings.
NOTES
[1] At this point, the trial court dropped the following footnote:

[Father] expressed concern that [Mother] is engaging the children in too many activities and that they have little free time to relax and enjoy themselves. That philosophical parenting difference warrants further discussion between [Father] and [Mother] as joint legal custodians. It is not a "tipping point" in the court's resolution here, albeit the rural farm setting which the children will experience in the summer may serve to provide a certain balance to the more hectic pace of life during the school year.
Appellant's App. at 51.
[2] At this point, the trial court dropped a footnote that reads in relevant part as follows:

That this conclusion conflicts with that of psychologist [Megan] Thomas and Guardian-Ad-Litem Amber La[p]aich warrants additional observations.
First, the demeanor of [Megan] Thomas in offering her opinion, the manner in which it was phrased and tentatively stated [that the present situation was "probably the best"], her limited knowledge of facts, and the fact that her involvement with the children came at the behest of [Mother], rendered that recommendation less than compelling.
Second, it is noted that Guardian-Ad-Litem Amber La[p]aich is a licensed attorney with family law experience who is quite familiar with the "best interest" standard for custody determinations. Her recommendation that the status quo continue on a permanent basis comes in her written report filed June 17, 2010. Nowhere in that report does she expressly state that residential placement with [Mother] is in [K.W.'s] best interests. She does expressly state on page 4 that "It is in [A.W.'s] best interest to keep the current custody and parenting time arrangement.["] She immediately follows that conclusion with the statement that "Although [K.W.] still really wants to live with his father, at this time[, it] is in both of the children's best interest to remain residing together.["] On those twin bases Ms. La[p]aich would have [K.W.] continue residing with his mother. With all due respect to Ms. La[p]aich, whose service here has been exemplary, the court takes, in part, a converse approach. That is, testimony indicated that it was [A.W.] who had the flexible capability to be happy wherever she was placed. Accordingly, if this was simply a question of which child should follow the other, it was the more mature and troubled child [K.W.'s] desires that ought to be served. Still, as the findings indicate, other matters of extended family, locale, and continuity of school and friendship also are found to be factors which on the best interests of the children [sic] and played a significant role in the court's ultimate determination.
Appellant's App. at 77.
[3] Mother asserts that in a custody modification proceeding, "the moving party bears the burden of demonstrating that an existing custody order is unreasonable." Appellant's Br. at 15-16 (citing Lamb v. Wenning, 600 N.E.2d 96, 98 (Ind.1992)). We note that the legislature amended the custody modification statute in 1994 "and removed the requirement of unreasonableness. Thus, a petitioner is no longer required to show that an existing custody order is unreasonable before a court will modify it." Julie C. v. Andrew C., 924 N.E.2d 1249, 1258 (Ind.Ct.App.2010) (footnote omitted).
[4] Because we decide this issue on waiver grounds, we need not address Father's arguments regarding res judicata or Mother's arguments based on Lovko v. Lovko, 179 Ind. App. 1, 384 N.E.2d 166 (1978), trans. denied, and Abell v. Abell, 627 N.E.2d 1366 (Ind.Ct. App.1994). In her reply brief, Mother quotes Heiligenstein v. Matney, 691 N.E.2d 1297 (Ind.Ct.App.1998), for the proposition that "[w]hat a trial judge says during an evidentiary hearing is not necessarily indicative of the legal standard he will apply once all of the evidence has been presented to him." Id. at 1301. Because Senior Judge King gave the parties written notice of the standard that he would apply several months before the custody hearing, and because waiver was not at issue in Heiligenstein, we find that case distinguishable.