

**FILED**

Mar 05 2020, 8:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rebecca Eimerman
Zionsville, Indiana

ATTORNEY FOR APPELLEE

Scott F. Bieniek
Bieniek Law, P.C.
Greencastle, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tanner Hecht,<br>*Appellant-Petitioner,*<br><br>v.<br><br>Taylor Hecht,<br>*Appellee-Respondent,* | March 5, 2020<br><br>Court of Appeals Case No.<br>19A-DC-1934<br><br>Appeal from the Putnam Superior<br>Court<br><br>The Honorable Christopher A.<br>Newton, Special Judge<br><br>Trial Court Cause No.<br>67D01-1705-DC-78 |

**Robb, Judge.**

# Case Summary and Issues

[1] Tanner Hecht ("Father") and Taylor Hecht ("Mother") had two children together, B.H. and T.H., before divorcing in 2017. The divorce decree, which incorporated the parties' settlement agreement, provided that the parties would share joint legal and physical custody of the children. In 2018, Mother filed a Petition to Modify Custody, Parenting Time, and Related Matters, seeking sole legal and primary physical custody of the children. Father filed counter-motions, asking the trial court to award him sole legal and primary physical custody of the children. The trial court found no grounds to change legal or physical custody of B.H. or physical custody of T.H., but found that Mother should be granted sole *legal* custody of T.H. Father now appeals, raising two issues for review: (1) whether the trial court applied the wrong legal standard when it awarded Mother sole legal custody of T.H.; and (2) whether the trial court abused its discretion in awarding sole legal custody of T.H. to Mother. Concluding the trial court applied the proper legal standard and did not abuse its discretion in modifying legal custody, we affirm.

# Facts and Procedural History

[2] Mother and Father were married in 2012, and have two children together: son B.H., born January 23, 2009, and daughter T.H., born September 17, 2011. When Mother and Father divorced in October 2017, the dissolution decree,

agreed to by the parties, provided that the parties would share joint legal and physical custody of the children. Additionally, Mother was entitled to parenting time during the school week and on the first weekend of every month. Father would exercise parenting time on all other weekends and on every Wednesday evening, with the exception of the week preceding Mother's weekend, when Father was entitled to have the children Tuesday and Thursday evenings. The parties agreed to a summer parenting-time schedule that consisted of alternating weeks, with the parent not having the children for the week entitled to a midweek visit.

[3] T.H. is diagnosed with Williams Syndrome, "a rare genetic disorder characterized by mild to moderate intellectual disability, attention deficit disorder, impulse control[ ] and cardiovascular problems. . . . [T]here is no cure, but there are ways to improve [T.H.'s] quality of life through behavioral therapy and medication." Appealed Order at 3.

[4] T.H.'s diagnosis compels particular educational and medical needs. For example, regarding her education, T.H. is assigned to a general education classroom and receives instruction from her general education teacher – but also is assigned a personal aide to accompany her in the general education classroom. T.H. also spends time during her school day in a special education classroom, where she receives individualized instruction. As for her medical needs (relevant to the case before us), T.H.'s geneticist has recommended that she take a medication called Abilify to control her impulsivity.

[5] The parties' requests for a change in legal and physical custody of the children arose from their inability to agree on T.H.'s educational path and whether T.H. should be medicated to control her impulsivity. The parties' disagreement in these areas has resulted in inaction on their part and a delay in crucial decision-making regarding T.H.'s needs.

[6] Educationally, the parties disagreed on whether T.H. should matriculate to the second grade. T.H.'s educational team (i.e., her general education teacher, special education teacher, individualized education program (IEP) coordinator, and aide) agreed she was not intellectually prepared to matriculate to second grade. Nevertheless, the educational team recommended that T.H. continue to matriculate with her classmates to second grade and through high school. The team further recommended waiting until high school before holding T.H. back a grade, so that she could maximize her credit hours to secure a graduation certificate. Mother strongly disagreed with the recommendation to allow T.H. to matriculate with her classmates. Father agreed with the educational team's recommendation.

[7] The parties also disagreed as to whether T.H. should be medicated to control her impulsivity. T.H.'s geneticist recommended that she take Abilify. Weight gain is a common side effect of the drug – which is a positive side effect for Williams Syndrome patients because individuals with the syndrome experience

difficulty in attaining healthy weight during childhood.[1] However, failure to regularly take Abilify, as prescribed, increases the risk of harmful side effects such as the possibility of seizures and death. Mother desired that T.H. take Abilify. Father opposed the use of the drug because of the potential side effects. He preferred that T.H. try behavioral therapy before resorting to medication. The geneticist wrote a prescription for the drug, and Mother filled the prescription; however, Mother did not administer the drug to T.H.[2]

[8] In June 2018, Mother filed a Motion to Modify Custody, Parenting Time, and Related Matters. She alleged, among other things, that because "Father refuses to communicate and discuss medical decisions about the minor children[,]" a "continuing and substantial change in circumstances [has] occurred[,]" and that it is in the children's "best interest for Mother to have legal and physical custody of the children." Appellant's Appendix, Volume 2 at 32, 33. In July 2018, Father filed a Verified Petition for Modification of Physical Custody, Parenting Time, Child Support and the Child Tax Credit. While his July petition was pending, Father, in December 2018, filed a Verified Petition to Modify Legal Custody, In Addition to Physical Custody. He alleged, among

---

[1] Mother testified at the evidentiary hearing that children with Williams Syndrome are "anywhere from thirty to fifty percent (30-50%) smaller than typical peers." Bench Trial Hearing Continued, Volume III at 40.

[2] T.H. does take a separate medication for her Attention Deficit Hyperactivity Disorder ("ADHD").

other things, that it was in the best interests of the children that custody be modified to award sole legal custody to him.

[9] An evidentiary hearing was held on May 31, 2019, then continued to June 14, 2019. During the hearing, Mother testified that she was not asking for any change in custody regarding B.H. but, instead, sought sole legal custody of T.H. because she and Father could not agree on educational and medical matters that affected T.H. Mother testified that

> my biggest concern is um we've had a couple of issues come up that we have tried to resolve together um and we haven't been able to come to an agreement or what road to travel down or what to try um and I'm just worried that in the future, if we keep having little things[,] that may add up over time to where it may be a decision that has to be made quickly and if we can't decide we can't drag it out for months[.]

Bench Trial Hearing Continued, Volume III at 36. Mother indicated that when it came to making decisions regarding T.H.'s educational and medical needs, Father stymied co-parenting efforts by delaying in providing input and consent, which made decision-making very difficult. Mother testified that Father's responses to her requests for input included: "'okay' or 'I'll talk to you, we'll talk about it, I'll look into it' and that's it, there's no follow up like 'hey, I had a chance to look at it this weekend' there's no follow ups. And I'm left with that, and I'm not [going to] keep bugging him over and over every week, 'what do you think, what do you think, what do you think.'" *Id.* at 73.

Regarding whether the parties could effectively co-parent over matters involving T.H., the trial court questioned Mother as follows:

> [THE COURT]     Do you think that the two (2) of you can continue to manage this co-parenting for the medical and other decisions for [T.H.] together?
>
> A     No.
>
> [THE COURT]     And to parent in contrast to your son.  Can you do that with [Father]?
>
> A     Yes.
>
> [THE COURT]     Sort of just the nature of [T.H.'s] sort of special medical needs that's driving this whole, whole thing?
>
> A     Correct.
>
> [THE COURT]     You feel your daughter would benefit from sort of a quarter-back [sic] or a decision maker?
>
> A     Yes.
>
> [THE COURT]     You feel these delays in the ability to communicate is [sic] impeding development?
>
> A     Yes.

*Id.* at 51. Conversely, Father testified that he did co-parent with Mother and that he worked very hard to include Mother, attend events with Mother, and invite her to attend events with the children during his parenting time. Father also testified that he communicated to Mother his specific concerns regarding matters related to T.H.'s educational and medical needs; however, his position regarding the matters did not always align with Mother's position.

[11]    On July 16, 2019, the trial court entered its order, determining (among other things) that sole legal custody of T.H. should be in Mother. The order reads, in relevant part:

### Factual Background

\* \* \*

> The present dispute results from the inability of the parties to agree on [T.H.]'s medical and educational needs. At several points throughout trial, the Court witnessed first-hand Mother's complaints regarding the breakdown in communication between the parties.

> For example, [T.H.]'s educational team recommended [T.H.] receive speech therapy as part of an extended 2018-2019 school year at her end-of-year meeting. Mother believed [T.H.] would benefit from the additional services and sought Father's input and consent. Mother became frustrated by Father's response, which consisted generally of "I'll think about it." After hearing the recommendation from the educational professionals again

in Court, Father had a difficult time vocalizing his position on the matter when questioned by the Court.

Father responded in a similar fashion to questions regarding a dispute over medication recommended by [T.H.]'s geneticist to control impulsivity. Father conflated attention difficulties, for which [T.H.] is prescribed medication, and impulsivity, for which she is not. Father expressed a general desire to keep [T.H.] off medication, but acknowledged he consented to the ADHD medication. He also expressed a desire to try behavioral therapy before medication to address issues of impulsivity but made no attempt to locate a doctor to provide the services within his self-imposed limits (outside of [T.H.]'s school day). This opposition, coupled with a refusal to actively participate in [T.H.]'s care, results in inaction that is detrimental to [T.H.]'s well-being.

The parties also disagree on whether [T.H.] should matriculate to the second grade. [T.H.] was placed in a first-grade classroom during the 2018-2019 school year. [T.H.] received one-on-one instruction for one (1) hour during the school day and the school assigned her a personal aide to accompany her throughout the remainder of her day in the general education classroom. By spring semester, the teacher added the kindergarten curriculum to [T.H.]'s Chromebook because she was not able to keep pace with the first-grade curriculum. [T.H.]'s general education teacher, special education teacher, IEP coordinator, and aide agreed she lacked the skills necessary to matriculate from kindergarten to first grade and that she was not intellectually prepared to matriculate to second grade.

Nevertheless, the educational professionals recommend that [T.H.] continue to matriculate with her classmates through high school where she could be held back to maximize her chances of obtaining a graduate certificate. The educational professionals expected that [T.H.] would need additional one-on-one instruction as she falls further behind her peers. The recommendation creates a collision between competing goals:

(1) Allowing [T.H.] to remain in the general education classroom with her peers; and

(2) Requiring additional one-on-one instruction outside of the general education classroom.

Mother strongly disagreed with the recommendation to move [T.H.] to second grade. After considering the recommendation of the educational professionals, Mother prefers to hold [T.H.] back at various points throughout her educational career so that she does not remain in high school for several years after the graduation of her peers. For example, Mother suggested she might hold [T.H.] back now, once in middle school, and then in high school as necessary to allow her to maximize her potential, even if it means that [T.H.] might matriculate without a certificate from high school. Without the proper building blocks, Mother fears that [T.H.] will lack the necessary educational skills necessary to benefit from additional time in high school. Mother also expressed concern about the psychological effects of watching several classes graduate from high school if the parties wait until the end to hold

[T.H.] back.  Father generally agreed with the educational professionals.[3]

\* \* \*

## Legal Custody

\* \* \*

[J]oint legal custody is not working with respect to [T.H.].  That much was clear at various points throughout trial.  [T.H.]'s medical condition requires a decision maker.  As Mother explained, [T.H.] needs a quarterback.  That position, more than any on the field, is not well-served by indecision.  The parties are simply unable or unwilling to communicate and cooperate for [T.H.]'s well-being.  Inaction negatively impacts [T.H.].

---

[3] At the evidentiary hearing, the IEP coordinator explained how T.H.'s educational team arrived at the recommendation that T.H. should matriculate with her classmates:

So[,] we discussed, and it's the committee had um, come also to . . . an agreement after everyone's input [t]hat besides just the academic aspects of educating [T.H., t]here are many more aspect [sic] to her, then just reading and math.  And so[,] the fact that she have [sic] social connections um, being able to integrate and work cooperatively with her same aged peers, um that, we need to educate the whole child, and that would be best done by moving her on to the grade level with her, her peers.  But we also discussed that fact that she can stay in school until she is aging out at twenty-two (22) [years old] and the goal at this point is to[] work her towards a uh, diploma, and that it might be something that needs to be considered that if she is going to need extra years of education that maybe it be done in the upper grades when she's working towards those difference [sic] graduation pathways, um, because that would give her more time to do that rather than retaining her in the lower grade, because than [sic] you limit your amount of time you can still continue to work towards that at the upper grades.  Because she can continue [her education] until the age of twenty-two (22).

Bench Trial Hearing, Volume II at 27-28.

Mother acknowledged she does not have all the answers, but she demonstrated a willingness to seek out information and an ability to act on her findings. The Court is satisfied that Mother is not reckless and that she will generally try to make decisions that she feels are in the best interest of [T.H.]. Conversely, the Court witnessed first-hand Father's indecisiveness on matters of great import to [T.H.]'s well-being. Had the Court not intervened at the first hearing, [T.H.] would have lost the opportunity to benefit from the extended school year and speech therapy.[4] This is not to say that Father is making bad decisions, only that his indecision or refusal to seek out information to support his position has a negative impact on [T.H.]'s development.

The Court is not trying to punish one parent or reward another. Given the facts presented at trial, the Court believes that Mother is better positioned to serve as [T.H.]'s quarterback and Mother shall have sole legal custody of [T.H.]. The Court trusts that Mother will continue to consider Father's opinion when making educational, medical, and extracurricular decisions on [T.H.]'s behalf. Such behavior is consistent with the approach Mother has taken since [T.H.] was diagnosed with William's [sic] Syndrome.

Appealed Order at 2-6. Father now appeals.

# Discussion and Decision

---

[4] At the conclusion of the first day of the two-day hearing, the trial court directed the parties to allow T.H. to participate in speech therapy services. Bench Trial, Vol. II at 39, 124.

# I. Standard of Review

We review custody modifications for an abuse of discretion "with a preference for granting latitude and deference to our trial judges in family law matters." *Werner v. Werner*, 946 N.E.2d 1233, 1244 (Ind. Ct. App. 2011), *trans. denied*. This is because it is the trial court that observes the parties' conduct and demeanor and hears their testimony firsthand. *In re Paternity of C.S.*, 964 N.E.2d 879, 883 (Ind. Ct. App. 2012), *trans. denied*. We will not reweigh the evidence or judge the credibility of the witnesses. *Id.* Rather, we will reverse the trial court's custody determination only if the decision is "clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom." *Id.* (citation omitted). "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). It is not impossible to reverse a trial court's decision regarding child custody on appeal, but given our deferential standard of review, it is relatively rare. *See Montgomery v. Montgomery*, 59 N.E.3d 343, 350, 354 (Ind. Ct. App. 2016), *trans. denied*.

According to the record before us, neither party filed a Trial Rule 52(A) written request with the trial court for special findings and conclusions thereon. Instead, the trial court directed the parties to submit proposed orders. *See* Bench Trial, Vol. III at 198. We therefore treat the trial court's order as sua sponte findings of fact. *See Piles v. Gosman*, 851 N.E.2d 1009, 1012 (Ind. Ct.

App. 2006); *see also Estudillo v. Estudillo*, 956 N.E.2d 1084, 1089 (Ind. Ct. App. 2011).

[14] Sua sponte findings control only as to the issues they cover, and a general judgment standard will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). We will affirm a general judgment entered with findings if it can be sustained on any legal theory supported by the evidence. *Id.* When a court has made special findings of fact, we review sufficiency of the evidence using a two-step process. *Id.* First, we must determine whether the evidence supports the trial court's findings of fact. *Id.* Second, we must determine whether those findings of fact support the trial court's judgment. *Id.* "[W]e may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court." *Stone v. Stone*, 991 N.E.2d 992, 998 (Ind. Ct. App. 2013), *aff'd on reh'g,* 4 N.E.3d 666.

## II. Change of Legal Custody

[15] Father's argument on appeal is two-fold. He claims the trial court applied the wrong legal standard, and that the court abused its discretion when it awarded Mother sole legal custody of T.H. We address each argument in turn.

# A. Legal Standard

In determining that Mother should have sole legal custody of T.H., the trial court cited Indiana Code sections 31-17-2-13, 31-9-2-67, and 31-17-2-15. Specifically, in its July 2019 order, the court found as follows:

> Indiana Code § 31-17-2-13 provides that a court "may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interest of the child." Parties that share legal custody "share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." Ind. Code § 31-[9]-2-67. In determining whether to award joint legal custody, a court must consider:
>
> > (1) the fitness and suitability of each of the persons awarded joint custody;
> >
> > (2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;
> >
> > (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;
> >
> > (4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;
> >
> > (5) whether the persons awarded joint custody:

> > (A) live in close proximity to each other; and
>
> > (B) plan to continue to do so; and
>
> > (6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.
>
> Indiana Code § 31-17-2-15.

Appealed Order at 5.

[17] Father argues that the trial court applied an incorrect legal standard in determining that Mother should have sole legal custody of T.H. when it relied on Indiana Code sections 31-17-2-13, 31-9-2-67, and 31-17-2-15. Father maintains that it is "axiomatic that when there is a request to modify legal custody, the trial court must consider the following three statutes: [Indiana Code sections 31-17-2-8, 31-17-2-15, and 31-17-2-21]." Appellant's Brief at 10.

[18] Indiana Code section 31-17-2-21 (hereinafter, "Section –21") states in relevant part:

> (a) The court may not modify a child custody order unless:
>
> > (1) the modification is in the best interests of the child; and

(2) there is a substantial change in one (1) or more of
the factors that the court may consider under section 8
. . . of this chapter.

(b) In making its determination, the court shall consider the
factors listed under section 8 of this chapter. . . .

Indiana Code section 31-17-2-8 (hereinafter, "Section –8") lists the factors
to be considered in making an initial custody determination:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to
the child's wishes if the child is at least fourteen (14) years of
age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the
child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian . . . .

Indiana Code section 31-17-2-15 (hereinafter, "Section –15"), titled "Joint legal custody; matters considered in making award[,]" lists the factors to be considered by the trial court to determine whether an award of joint legal custody would be in the best interests of the child. *See supra* pp. 13-14.

[19] In *Julie C. v. Andrew C.*, 924 N.E.2d 1249, 1259-60 (Ind. Ct. App. 2010), we held that the trial court must consider three statutes when modifying legal custody: Indiana Code Section –8, Section –15, and Section –21. Particularly relevant to whether a court should modify joint legal custody to sole legal custody is whether there has been a substantial change in one or more of the factors the trial court considered when making the initial award of joint custody – that is, those factors enumerated in Section –15. *Id.* at 1260.

Moreover, as this Court explained in *Milcherska v. Hoerstman*, 56 N.E.3d 634, 641-42 (Ind. Ct. App. 2016), the second factor under Section –15 (that is, parental cooperation) is significant:

> Our courts have reiterated that factor (2), whether the parents are willing and able to cooperate in advancing the child's welfare, is of particular importance in making legal custody determinations. *Julie C.*, 924 N.E.2d at 1260; *see also Carmichael [v. Siegel]*, 754 N.E.2d [619,] 635 [(Ind. Ct. App. 2001)] ("One of the key factors to consider when determining whether joint legal custody is appropriate is whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare."). Where "the parties have made child-rearing a battleground, then joint custody is not appropriate." *Periquet–Febres v. Febres,* 659 N.E.2d 602, 605 (Ind. Ct. App. 1995)[, *trans denied*]. "Indeed, to award joint legal custody to individually capable parents who cannot work together is tantamount to the proverbial folly of cutting the baby in half in order to effect a fair distribution of the child to competing parents." *Swadner v. Swadner,* 897 N.E.2d 966, 974 (Ind. Ct. App. 2008) (quotation omitted).

Here, although the trial court did not specifically reference Sections –8 and –21, we find that the court applied the correct legal standard and considered all of the required statutory factors in determining that Mother should have sole legal custody of T.H. In its order, the trial court stated that it must consider the factors set forth in Section –15 in determining whether legal custody of T.H. should be modified. Although it did not make specific findings regarding each factor, we note that the trial court was not required to enter a finding as to each

factor it considered.  *See Russell v. Russell,* 682 N.E.2d 513, 515 (Ind. 1997) ("Although a court is required to consider all relevant factors in making its determination, it is not required to make specific findings [when ruling on a motion to modify custody]."  Such findings are only required if requested in writing pursuant to Indiana Trial Rule 52(A).  *Id.* at 515 n.2.  Neither party made such a request.  Also, although the trial court's order does not specifically mention Section –8, we presume trial courts know and follow the law, *see Ramsey v. Ramsey,* 863 N.E.2d 1232, 1239 (Ind. Ct. App. 2007) ("[W]e generally presume trial courts know and follow the applicable law").  We may overlook this presumption "if the trial court's findings lead us to conclude that an unjustifiable risk exists that the trial court did not follow the applicable law." *Id*.  Here, however, the trial court's copious findings and conclusions do not permit us to reach such a conclusion.  Additionally, there is a great deal of overlap between the factors in Section –8 and in Section –15, such that considering the factors in Section –15 would cause the court to consider most of the factors in Section –8.[5]  Thus, we find the trial court applied the proper legal standard in making its determination.  No error occurred here.

---

[5] We note that when the trial court concluded that sole legal custody of T.H. should be in Mother, the court did not use the precise language set out in Sections –21 and –15, that is: "substantial change" and "best interests of the child."  *See* Ind. Code §§ 31-17-2-15, –21.  However, we do not consider this fatal to the trial court's determination, as the court provided detailed findings establishing that there was a substantial change in the parties' ability to communicate effectively and that modification of legal custody of T.H. was in her best interest.  And, the findings are supported by the evidence of record.  *See Stone*, 991 N.E.2d at 998 ("We

# B. Abuse of Discretion – Sufficiency of the Evidence

[22] Next, Father contends that the trial court abused its discretion when it awarded Mother sole legal custody of T.H. Specifically, Father asserts that the evidence presented at the hearing was insufficient to prove that a substantial change in circumstances had occurred, warranting the custody modification, and that his proposed custody modification would be in T.H.'s best interest.

[23] As stated above, we review custody modifications for an abuse of discretion "with a preference for granting latitude and deference to our trial judges in family law matters." *Werner*, 946 N.E.2d at 1244. We will not reverse unless the trial court's decision is against the logic and effect of the facts and circumstances before it or the reasonable inferences drawn therefrom. *Truelove v. Truelove*, 855 N.E.2d 311, 314 (Ind. Ct. App. 2006).

[24] Here, a review of the trial court's order clarifies that the custody modification is based on a substantial change in the parties' willingness and/or ability to communicate and cooperate in advancing T.H.'s welfare, resulting in a determination that it would be in T.H.'s best interest to award sole legal custody to Mother. The trial court originally ordered joint legal and physical custody of the children. In its order modifying legal custody, the court found

may affirm a general judgment with sua sponte findings upon any legal theory supported by the evidence introduced at trial.").

that no change of custody was required for B.H. because the parties were willing and able to communicate regarding matters involving their son. However, regarding T.H., the trial court found that a change in legal custody was warranted because the parties "are simply unable or unwilling to communicate and cooperate for [T.H.]'s well-being" and the "[i]naction negatively impacts [T.H.]" Appealed Order at 5. The court also found that it had "witnessed first-hand Father's indecisiveness on matters of great import to [T.H.]'s well-being" and that Father's "indecision or refusal to seek out information to support his position has a negative impact on [T.H.]'s development." *Id.* at 6.

[25] The evidence in the record supporting the trial court's findings include:

- Mother and Father are unable to agree about major decisions regarding T.H.'s educational and medical needs. Specifically, Mother wants T.H. to repeat first grade; Father wants T.H. to matriculate to second grade. Mother wants T.H. to take medication for impulse control; Father wants to place T.H. in behavioral therapy instead of using medication. Bench Trial, Vol. III at 36-38, 41-42.

- Mother and Father did not experience disagreements over T.H.'s medical care when they were married, and Mother acknowledged that she thought she and Father would be able to effectively communicate regarding T.H.'s medical needs after she and Father divorced. However, the parties are no longer able to effectively communicate regarding T.H.'s educational and medical needs. *Id.* at 54-55, 67-68.

- Father does not express to Mother his concerns or opinions regarding T.H.'s educational and medical needs, which prevents Mother from being able to make important decisions. *Id.* at 69, 72-73.

- Mother has educated herself on Williams Syndrome, attends conferences for the disorder, and is heavily involved in the Williams Syndrome Association. *Id.* at 69, 78.

- Father wanted T.H. to participate in behavioral therapy instead of taking medication for her impulsivity, and he researched behavioral-therapy options; but when Mother tried to talk to Father about therapy options, Father was not forthcoming with the information he had obtained. *Id.* at 136-138.

- Father wanted T.H. to participate in behavioral therapy outside of regular school hours, but did not take any steps toward enrolling T.H. in an after-school therapy program. *Id.* at 194.

[26] Father attempts to bolster his argument by highlighting instances where he and Mother were able to communicate, cooperate, and effectively co-parent regarding T.H.'s educational and medical needs; where he was decisive; and where he was willing to obtain the necessary information to make informed decisions. However, the trial court was entitled to give more weight to Mother's testimony that the parties were no longer able to come to an agreement and make timely decisions of import regarding T.H.'s well-being.

[27]    Ample evidence was presented at the hearing that Father and Mother are unable to communicate effectively regarding matters related to T.H.'s educational and medical needs; that they are incapable of co-parenting when it comes to these matters; but, they are loving and caring parents to T.H. individually. We emphasize that "joint custody is difficult when the parents are able to communicate effectively and almost always detrimental to the wellbeing of the child when they cannot. . . . There are times when a breakdown of communication between parents renders joint custody no longer in the best interests of the child." *In re Paternity of A.S.*, 948 N.E.2d 380, 387 (Ind. Ct. App. 2011) (affirming modification of physical custody where both parents requested modification). Here, the trial court heard the witnesses firsthand, observed their demeanors, and ultimately decided that Mother should have sole legal custody of T.H. Under the facts and circumstances of this case, we cannot second-guess that decision.

# Conclusion

[28]    The trial court applied the proper legal standard in determining whether legal custody of T.H. should be modified, and did not abuse its discretion in modifying legal custody. We affirm the trial court's decision awarding sole legal custody of T.H. to Mother.

[29]    Affirmed.

Bradford, C.J., and Altice, J., concur.