**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**YVONNE FERGUSON-WATKINS**
Ferguson-Watkins & Associates
Indianapolis, Indiana



FILED

Mar 31 2014, 6:24 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In re the Marriage of: | ) | |
| | ) | |
| TASHA BATES, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1306-DR-572 |
| | ) | |
| DAMON BATES, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Robert R. Altice, Jr., Judge
The Honorable Kimberly D. Mattingly, Magistrate
Cause No. 49D05-1112-DR-45904

**March 31, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Tasha Bates ("Mother") appeals the trial court's findings of fact and conclusions thereon dissolving the parties' marriage. She raises the following restated and reordered issues:

I.      Whether the trial court abused its discretion when it denied Mother's emergency motion to continue the final hearing;

II.     Whether the trial court erred when it denied Mother's Motion to Amend and/or Supplement Trial Documents;

III.    Whether the trial court's child support order was an abuse of discretion;

IV.     Whether the trial court's unequal division of the marital estate was an abuse of discretion; and

V.      Whether the trial court abused its discretion when it ordered Mother to pay a portion of Father's attorney fees.

We affirm in part and remand in part.

## FACTS AND PROCEDURAL HISTORY[1]

Mother and Father were married on April 23, 1999. They had one child together, T.B., born in July 2000. On December 2, 2011, Mother filed her petition for legal separation, and on January 5, 2012, Father filed his petition to convert the legal separation to a petition for dissolution, which the trial court granted.

---

[1] We note that Mother's Appellant's Brief does not include a Statement of Facts, as is required by Indiana Appellate Rule 46(A)(6), nor does her Appellant's Appendix include a chronological case summary as required by Ind. App. Rule 50(A)(2)(a). "The purpose of our appellate rules, especially Indiana Appellate Rule 46, is to aid and expedite review and to relieve the appellate court of the burden of searching the record and briefing the case." *Thacker v. Wentzel*, 797 N.E.2d 342, 345 (Ind. Ct. App. 2003). We admonish Mother's counsel to, in the future, comply with our appellate rules.

The parties never owned a marital residence together. For a number of years, they rented residences in which to live. At some point, the parties moved into a home owned by Mother's mother on West 58th Street in Indianapolis, and in 2009, Mother's mother gifted that house to Mother individually. The parties lived together at that house until the end of September 2011, when Father moved out.

During the course of the marriage, Father concurrently worked two separate forty-hour-per-week jobs. *Tr.* at 20 ("I've held down two jobs for over 22 years."). However, sometime in 2010 or 2011, Father's mother ("Mrs. Boyd") became terminally ill with a brain tumor, and he began providing daily physical care for her. In order to do so, he quit one of his two jobs, at Aaron's Sales and Rental, where he was earning $10.00 per hour, driving a delivery truck and doing assembly work. In the fall of 2011, Father still was working for I.U. Health in the Supply Chain Operation department, earning $16.25 per hour. Sometime in October 2011, he requested and received a three-week leave of absence from work through FMLA, in order to take care of his mother. Mrs. Boyd passed away on October 31, 2011. Father did not receive I.U. Health's written notice advising him on the date to return to work, because it was sent to the 58th Street residence. I.U. terminated Father's employment.

For most of the marriage, Mother was also employed outside the home. From about 2000 to 2007, Mother was employed in a supervisory capacity with Indiana Mentor earning approximately $45,000.00 per year. However, around 2007, T.B. was failing her first grade classes, and Mother and Father were concerned about her grades. Mother quit her job at Indiana Mentor, in order to be home more and available to T.B. Around this time frame,

3

Mother and Father completed necessary paperwork and were approved to have foster children in their home.

In January 2012, the trial court held a preliminary hearing. Father was still unemployed, although he testified to having applied to over fifteen places for employment. The financial declaration imputed $290 per week in income for Father, which was calculated based on minimum wage. Mother testified at the hearing that she was working at Pizza Hut, fifteen hours a week, making $7.50 per hour. She also received a $60 per diem for a two-year-old foster child in her care. Father was expected to receive an inheritance from his mother, Mrs. Boyd, who was awarded a significant class action lawsuit settlement before her death. Upon Mrs. Boyd's death, the inheritance was placed in a trust, which later would be distributed after her estate matters were completed. At the conclusion of the preliminary hearing, the trial court ordered that it was in the best interest of the child to grant physical custody of T.B. to Mother and that the parties share joint legal custody. The trial court ordered each party to pay his or her own attorney fees and ordered that Father was entitled to visitation pursuant to Indiana Parenting Time Guidelines. *Id*. at 52.

On February 8, 2013, several days before the final hearing, Mother moved for an emergency continuance of the final hearing due to illness of both T.B. and the foster child, which Mother's counsel asserted made it not possible for Mother to attend the hearing. The court permitted a hearing on the matter on the morning of February 11, the date the final hearing was to begin. After receiving argument and evidence, the trial court denied the request to continue and proceeded with the final hearing. Prior to the start of evidence, the parties stipulated that Mother would have primary physical custody of T.B. and that the

parties would share joint legal custody. The parties also stipulated that Father would have parenting time pursuant the Guidelines. Remaining at issue, then, were the matters of division of marital property and child support.

A significant portion of the hearing was devoted to the issue of Father's inheritance from his mother, including portions that were distributed to T.B. At the hearing, Father called as a witness a bank trust officer to testify as to the final distribution to Father in December 2012, in the amount of $415,219.85, as well as several prior distributions: including $1,125.00, which was applied to child support owed for T.B. Father also called attorney Christi Anderson, who was the attorney that prepared Mrs. Boyd's estate plan and handled her estate. Anderson testified that Mrs. Boyd directed that 68% of her estate was to go to Father, who was her only child. None was directed to be given to Mother; in fact, Anderson testified that, although she met with Mrs. Boyd a number of times, including sessions to review and discuss family members and whether they would inherit anything, Anderson did not realize Father was ever married, as Mrs. Boyd never mentioned it. Anderson also testified that Mother filed various pleadings in the estate cause of action, which ultimately were dismissed or denied but cost the estate over $22,000 to defend.

Father also testified at the final hearing. He possesses a high school diploma but has no further education. He has no retirement or savings. The car he was currently driving, a 2007 Dodge Charger, was owned by his step-father, and he would be returning it to him. He testified that he lived with Mother in the 58th Street residence from approximately 2006 to 2011, and contributed to its property taxes and maintenance, but that he and Mother always kept their finances separate. As of the final hearing, he had

5

obtained employment doing "junking" for scrap metal through an employment agency, but that his goal was to further his education. He conceded he was behind in child support for T.B. as of the final hearing date. He said that he owed support for two other children, ages 18 and 20, as of the final hearing, and he testified that Mother had three other children, ages 18, 21, and 22 for which she sporadically received child support. Father testified that Mother and his now-deceased mother "were not close" and that Mother did not assist him in caring for his ill mother before her death. *Tr*. at 264.

Father offered a number of documentary exhibits to the trial court, which were admitted into evidence, including: (1) an appraisal for the 58th Street house, valuing it at $42,000; (2) a list of marital assets and debts, as known to him; (3) a proposed distribution of the marital estate; (4) a proposed child support worksheet; and (5) paycheck stubs and a W-2 form for 2011. Father also submitted an attorney fee itemization, which the trial court took under advisement. Father's child support worksheet imputed income to him in the amount of $10/hour at forty hours per week, resulting in a child support obligation of $3.00 per week; however, Father testified that he was willing to pay $70-80 per week in child support for T.B. *Id*. at 274.

Mother did not appear in person at the final hearing until mid-afternoon. While she did present testimony, she did not offer or present any exhibits at the final hearing. As to her prior employment, she testified that she had been working in a supervisory capacity[2] at

---

[2] Concerning her supervisory position at Indiana Mentor, Mother testified that "you have to have a degree to get that job," but that she did not "have a degree," explaining that she obtained the position simply by having been employed there so long. *Tr*. at 277. From this, it appears Mother did not have a college degree at the time she was hired, but it is not clear whether she ever earned a college degree during the course of her employment or marriage.

Indiana Mentor from approximately 1999 or 2000 until 2007, when she voluntarily left, out of concern for T.B. and her failing grades, believing she and Father were gone and working so much that it was negatively affecting T.B. Since leaving Indiana Mentor in 2007, Mother cared for foster children in the home, receiving what had been a $60.00 per diem, but which was reduced to $29.43 per diem in January 2012. Additionally, Mother was working an unidentified number of hours at Pizza Hut. She requested that the trial court award her half of the inheritance that Father received from his mother's estate. On March 7, 2013, Mother filed a motion to supplement and/or amend trial documents, which the trial court denied.

Father timely filed a motion requesting that the trial court issue Findings and Conclusions pursuant to Indiana Trial Rule 52. In May 2013, the trial court issued its findings of fact and conclusions thereon and decree of dissolution of marriage.[3] The trial court included the inheritance in the marital estate, finding that the value of the net marital estate was $472,210; however, but for the gift of the 58th Street home and the inheritance, the parties would have a negative marital estate value. The trial court's findings and conclusions included the following:

18.  Husband's income potential is approximately $10 per hour gross or $20,800 gross income annually.

19.  Husband has a high school diploma and has no post-secondary education.

20.  During the marriage, Wife was a manager at Indiana Mentor earning a salary of $45,000 annually until she voluntarily left this position.

---

[3] We commend the trial court on the thoroughness of its findings and conclusions, which greatly facilitated appellate review.

7

22. The parties also had the care and custody of one to two foster children during the majority of the marriage, for which Wife received a stipend of $1,800 per month. Wife continues to have one foster child in her care for which she receives a monthly stipend of $620.

23. Wife receives child support of $56 per week [] for her prior-born children.

24. Husband has two prior-born children, not of the marriage, for which he pays weekly child support in the amount of $79.

42. The Court has discretion to value Husband's inheritance at any date between final separation and final dissolution of marriage. Therefore, the Court finds that Husband received a distribution check in the amount of $415,011.51 on December 12, 2012. The Court adds Husband's pre-distributions that were made to him for payment of child support of $1,125 on November 19, 2012 and $175 on December 19, 2012, to this amount, and find that the total value Husband received, to be included in the marital pot from his inheritance, is $416,567.

43. The Court finds that Wife already received a value of $15,505 from Husband's inheritance, which was Husband's 68% of the fees spent out of the inheritance funds that would have otherwise been distributed to the beneficiaries but for Wife's repeated and meritless claims, complaints, and requests against the estate.

54. Husband's mother died on October 31, 2011, which was 32 days before Wife filed her petition for Legal Separation.

56. Husband's mother's estate was not closed, and distribution made to Husband, until December 21, 2012.

57. Husband has at all times kept the monies received from his mother's estate separate. He did not receive distribution of the funds until approximately a year and two months after final separation and 52 days prior to final hearing herein, which was continued by Wife multiple times.

61. There is no showing that Wife made any contributions to the acquisition, preservation, or enhancement of the inherited property.

8

66. The inheritance from Husband's mother was to Husband and the parties' daughter; Wife was not mentioned in her will or trust documents.

68. Husband did not, at any time, treat the inherited property as marital.

96. The court finds that both Husband and Wife are voluntarily underemployed by choice as Husband is choosing to scrap junk for approximately $250 gross per week and Wife is choosing to foster a child for a monthly per diem of $620.64, nontaxable[.] . . . However, no evidence was presented that either party is underemployed for the purpose of avoiding payment of child support for their daughter. In fact, Husband testified he would agree to a higher amount than recommended by his Child Support Worksheet.

*Appellant's Br.* at 18-30.

The trial court determined that Father rebutted the presumption that an equal division was fair and reasonable, awarding $416,576 (or 88% of the marital pot) to Father and $55,634 (or 12%) to Mother. The trial court ordered Father to pay $70 per week in child support, and it also ordered Mother to pay $10,000 toward Father's attorney fees within 90 days. Mother now appeals.

## DISCUSSION AND DECISION

### I. Mother's Motion for Continuance

On Friday February 8, 2013, Mother, by counsel, requested an emergency continuance of the Monday, February 11 final hearing because both T.B. and the parties' foster child[4] were ill. The trial court permitted a hearing on the motion on the morning of February 11. Mother's counsel was present, as were Father and his counsel; however, Mother was not.

---

[4] As of that time, the parties jointly possessed a foster-care license. *Tr.* at 70.

Counsel for Mother explained that T.B. and the foster child both were suffering from an upper respiratory infection, and the foster child, who was described as "challenged," also had bleeding from the ear due to an ear infection necessitating a trip to the emergency room over the preceding weekend. *Tr.* at 68. Mother's counsel explained that there are rules concerning in whose care a foster child may be left, "not everyone can care for those special children." *Id.* at 67. Father responded and explained that a number of adult family members were certified to care for their foster child. Additionally, the foster care organization, Benchmark, is available to find childcare in circumstances when a foster parent has to be somewhere, and according to Father, they had used that service before. With regard to T.B., Father had asked to exercise his visitation with her over the preceding weekend, assured Mother that he would seek medical care for T.B. if she needed it, but he did not receive the visitation. Father had told her that if T.B. needed to be home from school on Monday, the date of the final hearing, he would make arrangements for her care. He stated that the woman he lived with "for some[ ]time," was a nurse and could care for T.B. during the final hearing, if family members were not able to do so. *Id.* at 65.

The trial court denied the request for a continuance:

> Mom is facing very difficult choices, I understand that, but I'm not continuing the hearing. If mom prefers to take care of the foster child than be here, I understand that as a mom myself, but mom's had plenty of notice, she has repeatedly tried to continue this. . . . but she never reached out to dad, to any of dad's relatives, none of that. Uh, if mom doesn't want to be here, she doesn't have to be here, but we're still having a hearing."

*Id.* at 76-77.

10

The decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court. *Thompson v. Thompson*, 811 N.E.2d 888, 907-08 (Ind. Ct. App. 2004), *trans. denied*. An abuse of discretion may be found in the denial of a motion for continuance when the moving party has shown good cause for granting the motion. *Id*.

Here, Mother's reason for requesting a continuance was because both T.B. and the foster child had been sick over the weekend. The implication was that either or both children remained ill, as Mother was not present at the hearing, although there was no direct evidence presented as to their condition that date. Regardless, Father stated that he was able to, and desired to, exercise visitation with T.B. the prior weekend and had told Mother that he would take T.B. for medical care if needed, but that Mother appeared to be avoiding his calls, and the visitation never happened. He said he offered and would have made sure that arrangements would have been made for T.B.'s care if she needed to stay home from school, allowing Mother to attend the final hearing. Father also advised the trial court that various adult family members were licensed or certified to take care of the foster child, or alternatively, Benchmark would arrange for the child's care. Under these circumstances, the trial court was not presented with good cause to grant the continuance. The trial court did not abuse its discretion in denying Mother's request for an emergency continuance of the final hearing.

## II. Mother's Request to Amend and/or Supplement

The final hearing occurred on February 11, 2013. Thereafter, on March 7, 2013, Mother filed a Motion to Supplement and/or Amend Trial Documents under Indiana Trial Rules 15(B) and (D). Mother was seeking the trial court's permission to submit various

11

documents including: an affidavit; an amended financial declaration; an amended child support worksheet; an annuity statement for the last quarter of 2011; an attorney fee itemization for Mother's counsel; a certified copy of the Clerk's child support payment history; and reimbursement of Mother's foster child income, none of which she submitted during the final hearing. Father, by counsel, filed his response, stating that neither of the trial rules cited by Mother provided support for her request, as T.R. 15(B) concerned allowing amendments to pleadings in order to conform to the evidence, and T.R. 15(D) concerned amending pleadings to include transactions or events that occurred since the date of the original pleading. The trial court denied Mother's request.

Mother claims on appeal that "it is well established that Trial Rule 15 should be used liberally to permit Mother to supplement the record at the final hearing." *Appellant's Br*. at 6. However, as Father argued in his response to Mother's motion, T.R. 15(B) and 15(D) "ha[ve] nothing to do with supplementing exhibits to a record after trial that could have been produced at trial. Petitioner . . . seeks to supplement the record with evidentiary documents, not to supplement a pleading for purposes of conforming the pleading to the evidence[.]" *Appellant's App*. at 59. Those rules "ha[ve] nothing to do with allowing a party to supplement evidence after trial that could have been submitted at trial[.]" *Id*. We agree.

Mother asserted to the trial court in her motion, and again to us on appeal, that Mother's counsel, on or before the final hearing date,[5] "attempted to forward by email

---

[5] According to Mother, the trial court's January 25, 2013 case management order directed the parties to exchange exhibits by February 8, 2013, which was several days before the final hearing. *Appellant's App*. at 30.

copies of her exhibits; however, opposing counsel's email was infected with a virus which disallowed copies of the requested supplemental documents to be served upon opposing counsel." *Appellant's App*. at 30; *see also Appellant's Br*. at 5. However, even assuming Mother's counsel could not forward the documents to opposing counsel via email on February 8 due to a computer virus, this does not explain why the documents were not exchanged via email or in person in the remaining several days leading up to the February 11 final hearing, or, at a minimum, offered into evidence at the final hearing, of which all parties had notice. The trial court committed no error when it denied Mother's post-trial motion to supplement the record with evidence that seemingly could have been produced at the final hearing.[6]

### III. Child Support Order

On May 9, 2013, the trial court issued Trial Rule 52 findings of fact and conclusions thereon pursuant to Father's request. When a party has requested special findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Werner v. Werner*, 946 N.E.2d 1233, 1244-45 (Ind. Ct. App. 2011), *trans. denied*. We will reverse the judgment if it is clearly erroneous. *Id.* In reviewing the judgment, we first must determine whether the evidence supports the findings, and second we determine whether the findings support the judgment.

---

[6] In arguing that the trial court should have granted her request for an emergency continuance, Mother stated that she "appeared in the afternoon and was unable to present her witnesses and exhibits[.]" *Appellant's Br*. at 13. This general reference to an inability to present exhibits because of time constraints does not change our view that the trial court did not err in denying her Motion to Supplement and/or Amend Trial Documents.

*Id.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.*

> To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. We will not reweigh the evidence or assess witness credibility. Even though there is evidence to support it, a judgment is clearly erroneous if the reviewing court's examination of the record leaves it with the firm conviction that a mistake has been made.

*Id.* (quoting *Kondamuri v. Kondamuri,* 852 N.E.2d 939, 944 (Ind. Ct. App. 2006)).

A trial court's calculation of a child support obligation under the child support guidelines is presumptively valid. *Glover v. Torrence*, 723 N.E.2d 924, 936 (Ind. Ct. App. 2000). Reversal of a trial court's child support order is merited only where the determination is clearly against the logic and effect of the facts and circumstances. *Id.* In our review of a child support order, weight and credibility issues are disregarded and only the evidence and reasonable inferences favorable to the judgment are considered. *Id.* For the purposes of determining the parents' income in the child support guideline calculation, the definition of "weekly gross income" is broadly defined to include not only actual income from employment, but also potential income and imputed income. *Id.* at 936.

Here, Father presented testimony at the final hearing concerning his income and employment over the last number of years, including pay check stubs and a W-2 form, reflecting his 2011 income, when for most of the year he was working two full-time jobs. He also presented a proposed child support worksheet, which imputed $400 of weekly gross income to him ($10 per hour times forty hours) and $1,142 to Mother (based on $45,000 annual income). This resulted in a net child support obligation of $3.38 per week.

14

However, Father thereafter offered that he would pay between $70-80 per week in child support for T.B. Mother presented no child support worksheet, nor did she present any other testimony concerning her income or potential income, other than that which Father presented concerning Mother's previous $45,000 annual salary and the per diem she received for the foster child living with her.

The trial court's findings of fact determined that Father's current weekly gross income was $250 per week, and Mother's weekly gross income was $174 per week and, further, that both parents were voluntarily underemployed. *Appellant's Br*. at 30 (Finding of Fact Nos. 96, 103). The trial court gave credit to Father for a $79 child support obligation for his prior-born children, as well as parenting time credit for 63 overnights per year, and it gave credit to Mother for a subsequent foster child in her home. *Id*. at 31 (Findings of Fact Nos. 101, 104). The trial court ordered Father to pay $70 per week in child support to Mother, a deviation from the presumptive, via income withholding order when he is employed.

On appeal, Mother argues that the trial court abused its discretion because it "did not consider [Father's] inheritance in making the child support determination[,] which contravenes Indiana law." *Id*. at 6. Mother is correct that inheritance properly is considered in child support calculations. Child Support Guideline 3(A)(1) states in part, "Weekly Gross Income of each parent includes income from any source, except as [otherwise] excluded . . . and includes, but is not limited to, income from salaries, wages . . . gifts, *inheritance,* prizes, and alimony or maintenance received from other marriages." (Emphasis added.)

15

Mother relies on *Gardner v. Yrttima,* 743 N.E.2d 353 (Ind. Ct. App. 2001), as support for her argument that Father's inheritance was improperly excluded as gross income. There, a panel of this court determined that, generally, inheritances are properly considered in calculating a parent's weekly gross income, although ultimately the effect of the receipt of an inheritance on the determination of child support lies within the sound discretion of the trial court. *Id.* at 358. In making the determination, the trial court should consider the nature and use of the inheritance. *Id.* For instance, "[w]here an inheritance is in the form of cash or securities and is placed in income-generating assets, the interest, dividends, or other income from such assets should be included in gross income for purposes of determining child support." *Id.* In *Gardner*, we affirmed the trial court's decision to exclude the inheritance from the mother's gross income calculation due to the lack of evidence that she derived any regular, ongoing income from the inheritance. *Id.* at 359.

Here, the evidence presented, was that Father possessed a Key Bank account with a value of $415,266.34 as of January 28, 2013. In it, Father held $100,095.11 in cash equivalents, $219,075.77 in fixed income securities, and $96,095.46 in equities. *Appellant's Br.* at 21 (Finding of Fact No. 38); *Ex. Vol.* at 3 (*Resp't's Ex.* B). The bank account statement reflected an estimated annual income of $10,481.29; however, there was no separate testimonial evidence presented concerning income and interest received by Father from the inheritance. To the extent that the cash equivalents, fixed income securities, and equities produce actual income and interest to Father, we find this amount should have been included in the child support calculation. The trial court's comments

16

during discussion of preliminary matters, prior to the start of evidence at the final hearing, reflect the trial court's intention to include such income or interest in the child support calculation. Specifically, counsel for Mother was arguing that the inheritance should be considered in the child support determination. The trial court replied, "[I]f it generates income, of course it goes into his income for support purposes." *Tr.* at 85; *see also id.* at 85-86 ("[T]o the extent it will generate . . . interest, . . . then, yes, that would probably be included in his income for support purposes."). Counsel for Mother continued to assert that the entirety of the over $400,000 inheritance should be considered as Father's income, to which the trial court responded,

> I cannot assess his income for 2012 at $400,000 and order him to pay support on that amount. You know, to the extent that any liquid or income producing $100 grand in a bank account [will] earn maybe $2000 worth of interest this year. I can't imagine that's going to change child support a whole lot, but we'll consider that assuming there is evidence on all of that, absolutely, that would be part of the calculation.

*Id.* at 89. The findings and conclusions do not reflect that the income or interest from the inheritance was considered in the child support calculation; therefore, we remand for the trial court to clarify its calculation and/or recalculate child support to include Father's income from the inheritance if it was not already included.[7]

## IV. Division of Marital Estate

---

[7] Although Mother does not raise the issue of arrearage in her brief, we note that, during the final hearing, Mother alleged that a child support arrearage still existed (although the amount was not identified), and the trial court commented, "I think it's despicable that someone would be sitting on $400 grand and be behind in support even $10. Now, one of my orders from today will be to catch that [] up immediately[.]" *Tr.* at 249. Evidence admitted at the final hearing reflected that Father made payments toward child support arrearage to the Marion County Clerk on November 11, 2012 of $1,125 and December 19, 2012 of $175. *Ex. Vol.* at 15 (*Resp't's Ex.* O). The trial court's findings and conclusions do not address the matter of arrearage, if any still exists, and in accordance with the trial court's remark during the final hearing, the trial court also may address the issue of arrearage upon remand, if necessary.

Mother next asserts that the trial court erred in dividing the marital estate, maintaining that the trial court should have equally divided the inheritance from Father's mother. The law governing the division of marital property is a two-step process. *Estudillo v. Estudillo,* 956 N.E.2d 1084, 1090 (Ind. Ct. App. 2011). First, the trial court determines what property should be included in the marital estate, and second, the trial court divides the marital property. *Id.* All marital property goes into the marital pot for division, whether it was owned by either spouse before the marriage, acquired by either spouse after the marriage and before final separation of the parties, or acquired by their joint efforts. Ind. Code § 31-15-7-4(a).

The division of marital assets is a matter within the trial court's sound discretion. *Estudillo,* 956 N.E.2d at 1090. We will reverse only for an abuse of that discretion. *Id.* When a party challenges the trial court's division of marital property, that party must overcome the strong presumption that the trial court fully considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to this court's consideration on appeal. *Id.* We will reverse a property distribution only if there is no rational basis for the award, and although circumstances might have justified a different distribution, we may not substitute our judgment for that of the dissolution court. *Augspurger v. Hudson,* 802 N.E.2d 503, 512 (Ind. Ct. App. 2004). Where, as here, Father requested special findings of fact and conclusions thereon, we review a trial court's findings to determine if they are clearly erroneous, but review its conclusions *de novo,* even where the trial court labels them as findings. *Fobar v. Vonderahe,* 771 N.E.2d 57, 59 (Ind. 2002).

18

The trial court must divide marital property in a just and reasonable manner, including property owned by either spouse prior to the marriage, acquired by either spouse after the marriage and prior to final separation of the parties, or acquired by their joint efforts. Ind. Code § 31-15-7-4. An equal division is presumed to be just and reasonable. Ind. Code § 31-15-7-5. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence of the following factors:

> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
>
> (2) The extent to which the property was acquired by each spouse:
>
>> (A) before the marriage; or
>>
>> (B) through inheritance or gift.
>
> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.
>
> (4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.
>
> (5) The earnings or earning ability of the parties as related to:
>
>> (A) a final division of property; and
>>
>> (B) a final determination of the property rights of the parties.

Thus, while the presumption is an equal division of the marital property, the trial court may deviate from an equal division so long as it sets forth a rational basis for its decision. *Hacker v. Hacker,* 659 N.E.2d 1104, 1109 (Ind. Ct. App. 1995).

Here, the trial court determined that the net value of the marital estate, including the $42,000 house gifted to Mother and the $432,072 inheritance from Mrs. Boyd, was $472,210.00. Mother does not appear to contest the valuation of the marital estate;[8] rather, she argues that she should have received a greater percentage of it, namely, a greater percentage of the inheritance. The trial court's findings and conclusions reflect that it determined that the presumption of an equal division of marital assets had been rebutted and that unequal division of property was just and reasonable. In support of its decision, the trial court issued detailed findings and conclusions, including:

28. Husband's earning potential is approximately $10 per hour gross or $20,900 gross income annually.

20. During the marriage, Wife was a manager at Indiana Mentor earning a salary of $45,000 annually until she voluntarily left this position.

49. The parties accumulated no significant assets of their own efforts but rather all assets in the marital estate are either gifts or inheritances.

54. Husband's mother died on October 31, 2011, which was 32 days before Wife filed her Petition for Legal Separation.

55. Husband received 68% of his mother's estate.

56. Husband's mother's estate was not closed, and distribution made to Husband, until December 21, 2012.

57. Husband has at all times kept the monies received from his mother's estate separate. He did not receive distribution of the funds until approximately a year and two months after final separation and 52 days prior to final hearing herein, which was continued by Wife multiple times.

58. Husband's income potential is far less than Wife's.

---

[8] Indeed, as the trial court recognized: "Wife presented no evidence on the assets and debts of the marital estate or their values. Only Husband presented a marital balance sheet or any documentation on the assets, debts, or incomes of the parties." *Appellant's Br*. at 22 (Finding of Fact No. 45).

61.    There is no showing that Wife made any contributions to the acquisition, preservation, or enhancement of the inherited property.

62.    Wife did not increase the value of Husband's inheritance. In fact, Wife decreased the value of Husband's inheritance. Wife spent $15,505 of Husband's inheritance through her claims in the probate estate, which were dismissed.

63.    Wife did nothing to secure, protect, or contribute to the preservation of Husband's inheritance. . . . .

68.    Husband did not, at any time, treat the inherited property as marital.

79.    Absent Husband's inheritance, the property division is 100% to Wife and 0% to Husband.

The trial court's findings reflect that it properly considered the factors in Indiana Code section 31-15-7-5, including contribution of the parties, the conduct of the parties, and the relative earning ability of each party, and it set forth a rational basis for its decision. Evidence at the hearing supports the trial court's findings, and those findings support its judgment. Mother has not overcome the strong presumption that the trial court complied with the statute. Under the circumstances of this case, we hold that he trial court did not abuse its discretion when it determined that an unequal division of the marital estate was just and reasonable.

## V.    Attorney Fees

The trial court ordered that Mother pay $10,000 of Father's attorney fees, and it denied her request that Father pay her fees. Mother argues that the trial court abused its discretion in this regard because Father received $416,000 of the marital estate and

21

awarded approximately $55,600 to her, making her payment of $10,000 of Father's fees unreasonable.

The trial court has statutory authority to order a party to pay reasonable attorney fees for the opposing party pursuant to Indiana Code section 31-15-10-1. The trial court enjoys broad discretion in assessing attorney fees in dissolution cases. *Goodman v. Goodman*, 754 N.E.2d 595, 602 (Ind. Ct. App. 2001). In deciding whether to make an award of attorney fees, the court should consider the resources of the parties, their economic condition, their ability to engage in gainful employment and to earn adequate income, and any other factors that bear on the reasonableness of the award. *Id.* "'Misconduct that directly results in additional litigation expenses may properly be taken into account in the trial court's decision to award attorney fees in the context of a dissolution proceeding.'" *Id.* (quoting *Lewis v. Lewis,* 638 N.E.2d 859, 861 (Ind. Ct. App. 1994)). Reversal is proper only where the trial court's award is clearly against the logic and effect of the facts and circumstances before the court. *Bessolo v. Rosario*, 966 N.E.2d 725, 733 (Ind. Ct. App. 2012), *trans. denied.* Further, "'the trial court need not give its reasons for its decision to award attorney's fees.'" *Id.* (quoting *Thompson,* 811 N.E.2d at 905).

Here, in reaching its decision regarding award of attorney fees, the trial court cited to what it perceived as misconduct on the part of Mother. For instance, the trial court found that Mother caused additional unnecessary fees in a number of ways, including, by filing for repeated continuances, objecting to a second mediation date, requesting to supplement evidence after the final hearing, and making claims to the same assets, namely the

22

inheritance, in both the dissolution action as well as the estate proceedings, which claims ultimately were dismissed or denied. *Appellant's Br*. at 28 (Finding of Fact No. 89). Additionally, Father had requested in discovery that Mother provide an itemization of her requested attorney fees, and upon not receiving it, Father again requested the itemization of fees, this time via subpoena seeking that it be brought to court. However, Mother failed to produce these documents before or at the final hearing. Consequently, Father was not able to cross-examine Mother's counsel with regard to the reasonableness of her fees and the nature of the work performed. *Id*. (Finding of Fact No. 88); *Tr*. at 294-95.

Mother urges on appeal that "[t]he trial court [] did not consider the relative earning power of the parties when making its decision." *Appellant's Br*. at 15. However, as we previously discussed, the trial court's findings addressed the past incomes of the parties and specifically determined that Mother possessed a greater earning potential than Father. *Id*. at 24 (Finding of Fact No. 58 "Husband's income potential is far less than Wife's."). Thus, contrary to Mother's argument, the trial court considered the earning power of the parties. We find no abuse of discretion.

Affirmed in part and remanded in part.

BAILEY, J., concurs.

FRIEDLANDER, J., concurs as to Parts I through IV and dissents as to Part V without separate opinion.

23