**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 20 2014, 9:57 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**AARON M. COOK**
Camden & Meridew, P.C.
Fishers, Indiana

**JOHN F. ITTENBACH**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**THOMAS DENSFORD**
Bauer & Densford
Bloomington, Indiana

**E. PAIGE FREITAG**
Jones, McGlasson & Benckart
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PRITIKA PATEL, | ) | |
| | ) | |
| Original Appellant-Plaintiff, | ) | |
| | ) | |
| KALA PATEL, | ) | |
| | ) | |
| Consolidated Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 53A01-1311-PL-494 |
| | ) | |
| BHUPEN RAY, AMY RAY, INDIANA | ) | |
| HOSPITALITY REAL ESTATE & | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable E. Michael Hoff, Judge
Cause No. 53C01-0906-PL-1405

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

The Scottish Inn is a small hotel located on the west side of Bloomington that was owned by Shree Ram, Inc., (Shree Ram). The Scottish Inn eventually exhibited signs of significant financial struggle sometime in 2007.

In an effort to cure the problem, appellee-defendant Indiana Hospitality Real Estate and Management (IHREM) purchased the Scottish Inn in December 2007. The other appellees-defendants Bhupen and Amy Ray (collectively, the Rays) were the sole members of IHREM at the time of the sale.

Third party defendant-appellant Pritika Patel eventually became the administrator of her father Raman's estate. During his lifetime, Raman was the majority owner of Shree Ram. Various proxies were issued regarding the control and operation of the business, but some of those documents were not signed and proven at trial.

The Rays subsequently sold the business for nearly twice what they had paid. The Rays were sued for failing to repay a loan that resulted in lost profits from a second sale of the motel as well as IHREM's alleged failure to pay Raman his proper wages. Numerous claims, counterclaims, and cross-claims were filed in this cause of action involving Pritika, Kala (Raman's former wife), and the Rays.

The trial court determined that Pritika did not prevail on any of her claims, including her claim for additional wages or any amount for unjust enrichment. Pritika

also failed to prove that there were certain agreements between the Rays and IHREM regarding payments and the running of the business. We agree with that portion of the judgment and that the trial court properly determined that Kala was entitled to a judgment against the Rays for amounts that she had loaned to them.

On the other hand, Kala failed to show that she was entitled to recover under the theory of fraud or constructive fraud. It was also determined that the evidence at trial failed to establish that Raman was due additional unpaid wages from IHREM. However, Raman was entitled to judgment on a third party complaint and counterclaim that the Rays had filed against him. We therefore affirm the trial court's judgment in all respects.

### FACTS

As noted above, Shree Ram owned the Scottish Inn, a small hotel that was located on the west side of Bloomington. Raman Patel owned 85% of the 1000 shares of stock in Shree Ram, while Kala, his wife, owned 15% of the shares.

As manager of the hotel, Raman exercised authority over customer relations, hotel maintenance, banking, accounting for all income and expenses, and for payment of his own wages and compensation. Pritika is their daughter, and the Patels dissolved their marriage on September 19, 1986.

Sometime in 2007, Raman contacted Tom Lambrecht to request a reduction in the principal balance of the mortgage because the hotel was not able to pay its debts, including the mortgage. Lambrecht is an experienced businessman in negotiating small business administration, bank loans, and loan modifications. The Scottish Inn was not

profitable and was in severe financial distress as of May 2007. Kala lives in South Bend and owns a hotel there. She also met with Lambrecht in 2007 and discussed a sale of the Scottish Inn as a "dummy transaction" to obtain a reduction in the mortgage principle. Appellant's App. p. 33.

The Monroe County Assessor assessed the value of the Scottish Inn real estate at $1,123,600, effective March 1, 2007. Lambrecht helped Raman form a limited liability company, Indiana Hospitality Real Estate & Management LLC (IHREM). This LLC was organized on May 25, 2007. IHREM'S original members consisted of Rajen N. Patel, Jayshree R. Patel, and Jayesh B. Patel, with Rajen owning 900 units. Jayshree and Jayesh each owned fifty units. IHREM owned nothing when it was created. Raman intended to sell the Scottish Inn to IHREM and to secure a proxy to Rajen so that Raman could continue to own and operate the business after it appeared that he had sold it.

Rajen executed an irrevocable special power of attorney and irrevocable proxy on June 21, 2007, and recorded it that same day in the Monroe County Recorder's Office. Raman attempted to carry out his plan through a Statement of Understanding, dated July 20, 2007 (the "First SOU"). On July 20, 2007, Raman signed this document on behalf of Shree Ram and IHREM. That document appointed Raman as Rajen's attorney in fact and granted Raman an irrevocable proxy to execute Rajen's 90% control of IHREM, the proposed new owner of the Scottish Inn. Raman continued to work as the manager after IHREM purchased the Scottish Inn in December 2007.

4

According to the first SOU, the purchase price of the Scottish Inn and the real property and all improvements on the property was $550,001.01, which amounted to full satisfaction and release of the real estate mortgage. This was in furtherance of the plan to rid Shree Ram's portion of the mortgage. Moreover, this would net the mortgagor approximately half of the balance of the mortgage. Hence, Raman engaged Lambrecht to negotiate with the mortgage holder to secure an agreement to a short sale of the Scottish Inn for approximately half of the balance of the mortgagee and a $10,000 payment from Raman to release Raman from his personal guarantee of the mortgage.

Lambrecht is identified on the First SOU as the "exclusive consultant/agent of Buyer." Appellants' App. p. 30. Bhupen Ray and Amy Ray (collectively, "the Rays") purchased IHREM in conjunction with the purchase of the Scottish Inn. After the Rays agreed to purchase the Scottish Inn, and to use IHREM to do so, the Rays, Kala, and Raman reached unwritten agreements about how to proceed. Those terms of those agreements were disputed and are "very difficult for a stranger to determine and interpret." Id. at 32.

However, the evidence showed that the Scottish Inn real estate was worth about $1 million when IHREM purchased it. As a result, IHREM, and the Rays, the owners of IHREM, made a profit of $549,000 (less closing costs) on the resale of the Scottish Inn, given that IHREM purchased the Scottish Inn for $501,000.

Two additional Statements of Understanding dated October 2007 (the "Second and Third SOUs"), were signed by Raman on Shree Ram's behalf and both of the Rays on

October 5, 2007, and October 8, 2007. An undated fourth Statement of Understanding dated December 5, 2007, (the "Fourth SOU") was signed by Raman on Shree Ram's behalf and by the Rays on IHREM's behalf on that same day. Lambrecht is identified on the Second, Third and Fourth SOU as the "exclusive consultant/agent of Buyer." Appellants' App. p. 30. According to these SOU's, the purchase price of the Scottish Inn was $500,001. Id. at 29.

On November 7, 2007, Kala issued a cashier's check for $25,000 to Bhupen Ray. Kala issued a cashier's check for $20,000 to Bhupen Ray on December 11, 2007. Shree Ram received a bona fide offer to purchase the real estate for $750,000 while the sale was pending.

None of these three statements mention the several cashier's checks that Kala sent to the Rays totaling $170,000 around the dates of the transaction for the Scottish Inn that Kala and the Rays all agreed were related to the sale. The cashier's checks that Kala tendered to Bhupen Ray amounted to $120,000, and the check that Kala tendered to Amy was for $50,000. The Rays repaid some of the funds, and Kala acknowledged receiving $25,000 in partial satisfaction of the loan. As a condition of the sale of the Scottish Inn, HSBC Bank USA, Shree Ram's mortgagee, required total payment of $498,544.25 as a precondition to the release of the mortgage.

According to the Second, Third, and Fourth SOU, the purchase price of the Scottish Inn was $500,001, which was a decrease of $50,000 from the First SOU. None

of the statements referenced any type of profit sharing agreement should the Rays subsequently sell the Scottish Inn.

Kala and Pritika claimed that Bhupen agreed to execute an Irrevocable Special Power of Attorney and Irrevocable Proxy like the one that Rajen had executed. Bhupen denied that he agreed to do so, even though the plan was that Raman would pursue ridding himself of a large part of the mortgage debt, while retaining control of the hotel and the benefits of ownership, which required that Bhupen and Amy agree to assist him.

The Rays acquired ownership of IHREM from Rajen, Jayshree, and Jayesh, pursuant to an agreement for transfer on interest in and withdrawn from IHREM, dated October 24, 2007. The terms of the loan from Kala to the Rays were never reduced to writing. Accordingly, there is no loan document signed by either Kala or the Rays.

Because of the requirement of payment of nearly $500,000 to HSBC Bank by Shree Ram, the tax proration was removed from the HUD settlement statement and not shown thereon in order to increase the net proceeds for the sale available to pay Shree Ram's loan with HSBC Bank. The 2007 taxes payable in 2008 became due in the amount of $21,461.70 and were paid by the Rays.

The sale of the Scottish Inn closed on December 13, 2007. Following the sale, Raman continued to operate the hotel. More particularly, IHREM employed Raman as manager of the Scottish Inn from January 1, 2008, to September 21, 2009. Raman continued to preside over customer relations, hotel maintenance, banking, accounting for all income and expenses, and all employment matters and employee payroll, including

7

the payment of his own wages and compensation. The Wage and Tax Statement (FormW-2) issued by Sheree Ram for Raman Patel reflects wages, tips and other compensation in the amount of $12,000 in 2006 and $12,000 in 2007.

As noted above, the Scottish Inn was not doing well financially and Shree Ram was having difficulty paying the bills at the hotel, including the real estate mortgage in the approximate amount of $1 million. Sometime in September or October 2009, Jimmy Thompson overheard Raman's end of a telephone conversation that took place between Raman and Bhupen. Raman was angry and accused Bhupen of cheating him and not adhering to his part of the bargain. Raman accused Bhupen of signing a proxy and then backing out. Raman left the Scottish Inn two or three weeks later.

Raman's salary appears to have been $12,000 in 2006 and 2007. Raman set that salary as the majority owner of Shree Ram. In 2008, Raman received $20,000 from IHREM, but Raman was gone for two months of that year, so his salary on an annual basis was $24,000. However, in 2009, Raman received $14,590 from IHREM.

No evidence was introduced that Raman was ever promised, agreed to, or expected any different compensation from IHREM in 2008 and 2009, leaving aside the issues concerning the proxy. As noted above, Raman continued to control all of the day-to-day operations of the hotel in 2008 and until he left the hotel in 2009.

The evidence showed that Kala did not appoint Raman as her agent or attorney in fact regarding the loans that she made to the Rays. Rather, Kala mailed checks directly to the Rays, and she never directed them to repay those loans by sending checks to Raman.

8

Kala demanded repayment of the loans in January 2009. The Rays repaid Kala $25,000. The Rays also delivered three additional checks to Raman totaling $23,000, with the expectation that Raman would deliver those checks to Kala. However, Raman never did. On January 30, 2009, the Rays also delivered to Raman a cashier's check made payable to Kala for $75,000. Raman returned the check uncashed to the Rays five months later. The Rays paid the 2007 property taxes for the Scottish Inn, which came due in 2008 in the amount of $21,461.70. Kala did not agree to pay those property taxes for the Scottish Inn and did not agree that the Rays could deduct $21,461.70 for the property tax payment from the loan balance due to Kala.

On June 8, 2009, Kala filed a complaint against the Rays for their failure to repay the loan for the purchase of the Scottish Inn. The Rays subsequently filed their Answer to the complaint and asserted a counterclaim against Kala and a third-party claim against Raman. Raman asserted a third-party counterclaim and several amendments were tendered that involved changing and withdrawing certain claims. However, by the time the claims were tried at trial, the Rays had claims against Kala and Pritika, Kala had claims against the Rays, and Pritika had claims against the Rays.

Raman died in 2010, and on July 22, 2010, IHREM signed a contract to sell the Scottish Inn to Greer Land Company for $1,050,000. Pritika was appointed special administrator of Raman's estate on February 22, 2010. The Estate was substituted as a party for the claims by and against Raman. On July 22, 2010, IHREM signed a contract to sell the Scottish Inn to Greer Land Co., LLC for $1,050,000, and the real estate was

9

actually sold to Greer for $1,050,000, less the mortgage and approved closing costs, in August 2012.

All issues proceeded to a bench trial on April 24-26, 2013. Thereafter, the trial court entered ninety-five findings of fact and conclusions of law. Judgment was entered in favor of Kala against the Rays on her complaint and on the Rays' counterclaims, in favor of Pritika on the Rays' third-party complaint, and in the Rays' favor on Pritika's third-party counter claims. The trial court also denied Pritika's motion to correct error.

More particularly, a portion of the trial court's judgment provided that

75. Kala . . . has proven . . . that she loaned the sum of $170,000 to Bhupen and Amy Ray, and that Kala . . . made an unambiguous demand for repayment in January, 2009.

76. The parties agree that Bhupen and Amy repaid Kala the sum of $25,000.

77. Raman was not Kala's agent for the purpose of accepting loan repayments on Kala's behalf. Kala did not take any definitive action that would make it appear to Bhupen and Amy that Raman was her agent. Kala sent the checks directly to Bhupen and Amy, not through Raman. The Rays are not entitled to a credit for money they paid to Raman with the expectation that Raman would deliver it to Kala.

78. After crediting the Rays' payment to Kala of $25,000, Bhupen and Amy Ray owe Kala . . . $145,000 for money she loaned them. Kala . . . is entitled to recover a money judgment against Bhupen Ray and Amy Ray and Kala . . . is entitled to interest on that sum at . . . 8% from February 1, 2009.

79. Kala . . . did not agree to pay the real estate taxes for the hotel that were due in 2008, and she is not liable to the Rays for those taxes.

80. Bhupen Ray and Raman Patel had an agreement about some form of proxy for IHREM that failed to materialize. Kala and the Estate have proven that Bhupen failed and refused to execute and deliver a proxy to Raman, but they have not proven the terms of the proxy. While that proxy may have had the same terms as

the proxy that Rajen . . . signed when he was the majority owner of IHREM, the proxy could have had different terms. Rajen . . . was not expected to invest any money in the proposed sale of the hotel when it was contemplated that Rajen . . . would nominally control IHREM. The Rays invested about $100,000 in the purchase of the hotel, and they signed mortgage notes for the balance of about $400,000. While the Rays did use money that Kala loaned them for this purpose, they were obligated to pay that money back.

81. The court cannot simply assume or conclude that the proxy that Raman expected to receive from Bhupen, or from the Rays, would be identical to the proxy that Raman did receive from . . . Rajen, as the Rays had a different stake in the future of the hotel. Kala . . . and the Estate have not proven the terms of the proxy by the greater weight of the evidence.

82. Along with the proxy, Kala . . . and the Estate have proven by the greater weight of the evidence that Raman and Bhupen had an agreement about what was to occur after IHREM purchased the Scottish Inn. Given that the focus of Raman's efforts was to reduce his mortgage debt must maintain ownership and control over the real estate, it is very unlikely that the agreement did not include some form of sharing the profit from a subsequent sale of the Scottish Inn. Unfortunately, neither party chose to commit their agreement to writing.

83. Indiana Code 32-21-1-1 (Statute of Frauds) provides that a person may not bring an action involving any contract for the sale of land unless the promise, contract, or agreement on which the action is based, or a memorandum or note describing the promise, contract, or agreement on which the action is based, is in writing and signed by the party against whom the action is brought or by the party's authorized agent.

84. The value of the Statute of Frauds in this case is obvious. It appears that the Rays and Raman had an agreement, but its terms are unknown. Nevertheless, the Statute of Frauds may not be determinative of the claims of Kala and the estate if fraud or constructive fraud is involved in a transaction, and it appears that a party should be estopped from claiming the benefits of the Statute of Frauds.

85. In order to prevail on a theory of constructive fraud, one need not establish the existence of an actual intent to defraud. The result of the conduct triggers the application of the theory.

The mere nonperformance of an oral promise which falls within the scope of the Statute does not constitute such a fraud as would warrant the intervention of a

11

court of equity. But, if one party is induced by another, on the faith of an oral promise, to place himself in a worse position than he would have been in had no promise been made, and if the party making the promise derives a benefit as a result of the promise, a constructive fraud exists which is subject to the trial court's equity jurisdiction. [Citations omitted].

86. There is no evidence that Amy Ray had any discussions with Raman about the agreement to buy the Scottish Inn. This is especially relevant since Kala and the Estate maintain that they are the victims of fraud perpetrated on them by Bhupen, and, perhaps, by Amy.

. . .

88. [F]raud cannot be based on unfulfilled promises or on statements concerning future events. . . . Kala and the Estate have worked hard to cast Bhupen's statement about the proxy into a statement about an existing fact, but it is clear that they are complaining about a broken oral promise of future action.

89. Kala and the Estate have failed to prove that they are victims of fraud. First, they have not proven the terms of an agreement between Raman and Bhupen. Second, the implied promise they complain of is a promise of future action, and fraud cannot be premised on future action. It is also important to note that a person must use reasonable care in guarding against fraud. By proceeding with secret, unwritten agreements, Kala and Raman (and the Estate in Raman's shoes) did not use reasonable care to protect themselves from the conduct they complain of.

. . .

91. Kala and the Estate have failed to prove the existence of a relationship like a fiduciary relationship that would impose a special duty on Bhupen or Amy. More importantly, the equitable considerations that would impel a court to strive to avoid a potentially unfair result are singularly lacking here. It appears that Raman was actively engaged in inducing the mortgagee to part with half of the value of its property by orchestrating a sham transaction. The lack of clarity about the agreements in this case may have resulted from the parties' reluctance to place too much of their agreement in writing, as it could incriminate them.

92. Kala and the Estate have not proven that they are the victims of constructive fraud, or that they are entitled to equitable relief.

93. There is no evidence that Raman did not receive his salary from IHREM. Kala's testimony that managers at Shree Ram, Inc. were paid $36,000 per year is

12

not at all supported by any of the evidence. Raman decided the salaries and wrote the checks for Shree Ram, Inc. He, in fact, paid himself $12,000 per year in 2006 and 2007, not the $36,000 per year that Kala maintains was the salary for managers at the hotel. Raman continued to write the checks for IHREM in 2008 and 2009 after IHREM bought the Scottish Inn. It would be unreasonable to impose liability on IHREM because Raman declined to write himself a check.

Pritika and Kala now appeal.

## DISCUSSION AND DECISION

### I. Standard of Review

We initially observe that where, as here, the trial court issues findings of fact and conclusions of law pursuant to a party's request, we apply a two-tiered standard of review. Baird v. ASA Collections, 910 N.E.2d 780, 785 (Ind. Ct. App. 2009). We first determine whether the evidence supports the findings and then determine whether the findings support the judgment. Id. We review for clear error and will reverse only if the trial court's findings are unsupported by any evidence or reasonable inferences drawn from the evidence or if the judgment is unsupported by the findings and conclusions. Id. In conducting our review, we neither reweigh evidence nor judge witness credibility; rather, we consider the evidence in the light most favorable to the judgment. Id. With respect to the trial court's findings of fact, we defer substantially; with respect to its conclusions of law, we apply a de novo standard. Id.

### II. Judgment Against Pritika on Wage Claim

Pritika contends that the trial court erred in holding that the Rays were not liable under the Wage Claim Statute. More specifically, Pritika argues that the trial court's

13

findings compel the opposite result in light of "the trial court's specific finding that the amount of salary paid to Raman in 2009 was less than the amount of salary owed to Raman for 2009." Appellant's Br. p. 6.

We initially observe that the Wage Claim Statute, Indiana Code section 22-2-9-2, provides that "[w]henever any employer separates any employee from the pay-roll, the unpaid wages or compensation of such employee shall become due and payable at regular pay day for pay period in which separation occurred. . . ." In support of her contention, Pritika maintains that based upon the trial court's findings, it was bound to conclude that in 2009 IHREM failed to pay Raman $2,714 in wages due, which results in $5,428 in liquidated damages, plus trial and appellate attorneys' fees.

However, contrary to Pritika's suggestion, the trial court did not make a factual finding that Raman's annual salary in 2009 was $24,000. The court entered no specific finding regarding Raman' salary in 2009 other than the stipulated fact that his W-2 form showed that he earned $14,950 in 2009. Appellant's App. p. 31. As noted above, the trial court made the following findings related to Raman's wages:

64. Raman's salary appears to have been $12,000 in 2006 and 2007. Raman set that salary as the majority owner of Shree Ram, Inc.

65. In 2008 Raman received $20,000 from IHREM, but Raman was gone for two months of that year, so his salary on an annual basis was $24,000.

66. In 2009, Raman received $14,590 from IHREM.

67. There is no credible evidence that Raman was ever promised, agreed to or expected any different compensation from IHREM in 2008 or 2009.

14

Appellants' App. p. 34.

In light of the above, while the trial court determined that Raman's salary in 2008 was $24,000, it did not make any specific finding as to his annual salary in 2009. Thus, contrary to Pritika's assertion, we cannot say that the above findings do not "support only the conclusion that Raman's salary for 2009 was $24,000." Reply Br. p. 2.

The trial court also found that "Raman continued to control all of the day to day operations of the hotel in 2008 until he left in 2009, including deciding payroll, writing or directing checks for employees, paying other bills and making decisions about maintenance, etc." Id. at 34. Again, Pritika does not dispute these findings. And after weighing the evidence and witness credibility, the trial court determined that Pritika had failed to prove that the Wage Claim Statute was violated, based upon the facts and circumstances in the case. And in accordance with those findings, the trial court concluded in part that

> Kala's testimony that managers at Shree Ram, Inc. were paid $36,000 per year is not at all supported by any of the evidence. Raman decided the salaries and wrote the checks for Shree Ram, Inc. He, in fact, paid himself $12,000 per year in 2006 and 2007, not the $36,000 per year that Kala maintains was the salary for managers at the hotel.

Appellants' App. p. 38.

Again, the evidence established that Raman was responsible for determining his own salary and paid all checks, including payroll checks, during his tenure at the Scottish

15

Inn. As a result, there is no proof that the trial court erred with regard to its judgment as to the wage claim.

### III. Unjust Enrichment

Pritika next argues that the trial court erred in finding that she was not entitled to any proceeds for unjust enrichment. More particularly, Pritika contends that the trial court should have awarded her an amount for unjust enrichment in light of its finding that the Rays solely realized profits despite an agreement to split them.

In resolving this issue, we note that a claim for unjust enrichment is a legal fiction invented by the common law courts to permit a recovery where the circumstances are such that under the law of natural and immutable justice there should be a recovery. Zoeller v. East Chicago Second Century, Inc., 904 N.E.2d 213, 220 (Ind. 2009). To prevail on a claim of unjust enrichment, a plaintiff must establish that it conferred a measurable benefit on the defendant under circumstances in which the defendant's retention of the benefit without payment would be unjust.

In this case, the trial court found that "[a]fter [the Rays] agreed to purchase the Scottish Inn, the Rays and Kala and Raman reached unwritten agreements about how to proceed. Those agreements are disputed and are very difficult for a stranger to their transactions to determine." Appellants' App. p. 32. In its conclusions, the trial court determined "that Raman and Bhupen had an agreement about what was to occur after IHREM purchased the Scottish Inn." Id. at 36. Although the trial court also determined that "it is very unlikely that the agreement did not include some form of sharing the profit

16

from a subsequent sale of the Scottish Inn," the trial court stopped short of concluding that the agreement did, in fact, include a term that required a subsequent division or sharing of any future profits. Even more compelling, the trial court determined that "[Pritika has] not proven the terms of an agreement between Raman and Bhupen." Appellant's App. p. 37.

In light of these circumstances, it was the trial court's prerogative to weigh and assess the testimony at trial. Although the trial court found it "likely" that the parties may have discussed certain terms, the trial court was simply not convinced of the substance of any actual, final terms. Indeed, before Pritika could recover, she was required to prove the specific circumstances that entitled her to an amount for unjust enrichment. She failed to do so, and the trial court's conclusions acknowledge that failure.

Finally, the trial court's conclusions set forth above suggest that none of the parties involved entered the transaction with clean hands. It is well-settled that one who seeks equitable remedies must do so with clean hands. Fairway Developers, Inc. v. Marcum, 832 N.E.2d 581, 584 (Ind. Ct. App. 2005). See Appellants' App. p. 38, Conclusion 91 (observing that the lack of clarity about the agreements in this case may have resulted from the parties' reluctance to place too much of their agreement in writing, as it could incriminate them). That said, we conclude that the trial court properly denied Pritika's equitable claim for unjust enrichment.

IV. Failure to Prove Certain Alleged Agreements with the Rays and IHREM

17

Pritika next claims that the judgment must be set aside because the statute of frauds was not raised as an affirmative defense. As a result, Pritika contends that the trial court erred in concluding that she was barred by the statute from enforcing the Rays' promises against them unless they were the result of fraud.

We initially observe that the Rays and IHREM agree that they did not raise the statute of frauds as an affirmative defense. Rather, it is apparent that the trial court addressed the statute of frauds sua sponte.

Nonetheless, the evidence shows that Pritika and Kala failed to prove by a preponderance of the evidence the definitive terms of the parties' agreements related to an irrevocable proxy as part of the sale of the Scottish Inn. The trial court's findings not only support this alternate legal basis, but the conclusions that are expressly set forth address Pritika and Kala's failure to satisfy their evidentiary burdens in this regard.

And "where a trial court has made special findings pursuant to a party's request under Trial Rule 52(A), "we may affirm the judgment on any legal theory supported by the findings." Werner v. Werner, 946 N.E.2d 1233, 1244-45 (Ind. Ct. App. 2011), trans. denied. Contrary to the arguments that Pritika and Kala have raised on appeal, reversal is not required, even assuming the trial court erroneously applied a particular legal theory in rendering its judgment.

As noted above, the trial court discussed the statute of frauds in conclusions 83 and 84. Appellants' App. p. 36. However, the trial court's written findings and conclusions did not rely solely on the statute of frauds to support its ultimate judgment

18

against Pritika and Kala on their contract and fraud claims. Rather, as discussed above, the trial court made several findings and conclusions determining that, while it believed there were various agreements among the parties related to the sale of the Scottish Inn, Pritika and Kala simply failed to present sufficient and convincing evidence regarding the terms of any irrevocable proxy or post-sale issues.

In particular, as discussed above, the trial court found that there were various agreements between the Rays and Raman relating to the purchase of the Scottish Inn, but "those agreements are disputed and are very difficult for a stranger to their transactions to determine." Appellants' App. p. 32. The trial court expressly concluded that "Bhupen Ray and Raman Patel had an agreement about some form of proxy for IHREM that failed to materialize. Both Kala and the Estate [Pritika] have proven that Bhupen failed and refused to execute and deliver a proxy to Raman, but they have not proven the terms of the proxy." Appellant's App. p. 35. As a result, the trial court refused to merely assume that the terms of the proxy were the same as the proxy that Rajen signed and concluded that "Kala Patel and the Estate have not proven the terms of the proxy by the greater weight of the evidence." Id. at 36. The trial court further concluded that "Kala and the Estate have not proven the terms of an agreement between Raman and Bhupen." Id. at 37. As a result, the trial court did not simply invoke the statute of frauds sua sponte and then reject outright the claims of Pritika and Kala on the basis that the agreements concerned the sale of real estate and were not in writing. However, Indiana Code section 32-21-1-1 provides that the person may not bring an action involving any contract for the

sale of land unless the promise, contract, or agreement on which the action is based is in writing and signed by the party against whom the action is brought.

In other words, certain types of agreements fall within the Statute of Frauds and are <u>required</u> to be in writing to be enforceable. <u>See</u> <u>Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.</u>, 625 N.E.2d 1291, 1294 (Ind. Ct App. 1993), <u>vacated on other grounds,</u> (refusing to enforce oral employment contract that both parties acknowledged would last at least thirteen months). Here, the trial court surmised that agreements actually existed, but Pritika and Kala simply failed to prove the specific terms of the agreements they each allege in support of their claims for relief.

All of the parties agree that the facts related to the sale of the Scottish Inn in 2007 were complex. While Kala and Pritika maintain that certain <u>verbal</u> agreements had been reached that related to the sale, the Rays disputed the existence of any such agreements. And the trial court determined that the evidence as to the precise and enforceable terms of any oral agreements was lacking. In any event, the evidence shows that the Statute of Frauds prevails in such instances, regardless of the existence of such oral agreements or the terms of the agreements.

That said, Pritika and Kala indeed did not meet their respective burdens of proof by failing to prove the terms of certain agreements. Moreover, the existence of such agreements had to be in writing pursuant to the statute of frauds. Thus, we decline to set aside the judgments against Pritika and Kala with regard to these issues.

<u>V. Kala's Claim for Constructive Fraud</u>

20

Kala argues that the trial court erred in holding that her claim against Bhupen failed because she did present sufficient evidence of a fiduciary relationship that supported her claim for constructive fraud. Kala contends that she was entitled to a portion of the Rays' profits from the sale of the hotel in 2012, as well as an amount for unjust enrichment.

In resolving this issue, we note that constructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. Mullen v. Cogdell, 643 N.E.2d 390, 401 (Ind. Ct. App. 1995). The elements of constructive fraud are 1) a duty existing by virtue of the relationship between the parties; 2) representations or omissions made in violation of that duty; 3) reliance thereon by the complaining party; 4) injury to the complaining party as a proximate result thereof; and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party. Id.

A fiduciary relationship required for constructive fraud may be based on moral, social, domestic, or personal connections. Blaising v. Mills, 374 N.E.2d 1166, 1170 (Ind. Ct. App. 1978). However, the relationship in Blaising involved that of persons who used to be husband and wife, which the court found sufficient given the facts and circumstances where those parties were making representations to one another in anticipation of reconciling their marriage. Id. at 1169.

Here, there was no such special relationship between Kala and the Rays. At most, they were mere acquaintances, which is not enough to establish a special duty in light of

21

their relationship for purposes of constructive fraud. Thus, when considering the circumstances in Blaising, the trial court properly determined that Kala failed to establish the elements of her claim.

Additionally, we note that Kala directs us to Whiteco Properties, Inc. v. Thielbar, which involved a buyer and seller to a real estate transaction. 467 N.E.2d 433 (Ind. Ct. App. 1984). However, that case contains no discussion of the special duty necessary for constructive fraud, but our courts have determined that a constructive fraud may arise where the relationship between the parties is that of buyer and seller. See Scott v. Bodor, Inc., 571 N.E.2d 313, 324 (Ind. Ct. App. 1992) (holding that where the seller makes unqualified statements to induce another to make a purchase, the buyer relies on those statements, and the seller has professed knowledge of the truth of the statements, a constructive fraud occurs).

Here, no direct buyer/seller relationship existed. Rather, Kala alleged fraud related to the loan and proxy. Nonetheless, in Whiteco, there was no question about the specific "promises" made by the seller about some real estate to the buyers—namely that the seller promised there would be an unobstructed view of the lake, which was false.

On the other hand, in this case, the trial court repeatedly noted in its findings and conclusions that Kala failed to present sufficient evidence regarding the terms of any proxy that may have been related to her agreement to loan money to the Rays. Appellant's App. p. 35-36; Conclusions 80-81. As a result, the trial court correctly entered judgment against Kala with regard to her claim for constructive fraud.

22

CONCLUSION

In light of our discussion above, it is apparent that the trial court considered the numerous claims and counterclaims in this case, and, after weighing the evidence, properly determined that Pritika and Kala had not met their burden of proof as to their claims presented in this appeal. And, even though the trial court may have applied an incorrect legal theory regarding the applicability of the statute of frauds, there are alternate legal bases supported by the findings that support the judgment. Hence, we decline to enter judgment in Pritika's favor as to her wage claim or for unjust enrichment. We further decline to direct the trial court to reissue its findings without considering the statute of frauds, or to conduct proceedings for permitting Pritika to establish an exception to its applicability. We also affirm the trial court's judgment in favor of the appellees and against Kala with regard to her constructive fraud claim.

The judgment of the trial court is affirmed.

BARNES, J., and CRONE, J., concur.